FILED
2025 Sep-30 PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

CARRIE GREGERSON,                    )
                                     )
     Plaintiff,                     )
                                     )
v.                                   )    Case Number: 5:23-CV-00006-HNJ
                                     )
SOCIAL SECURITY                      )
ADMINISTRATION,                      )
COMMISSIONER, Frank Bisignano[1],    )
                                     )
     Defendant.                     )

## **MEMORANDUM OPINION AND ORDER**

In this action, Plaintiff Carrie Gregerson brings claims alleging that her employer,

the Social Security Administration (the "Agency"), discriminated and retaliated against

her in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et

seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; and the

Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.  (Doc. 23).[2]  The parties have

---

[1] The only proper defendant in an action that raises employment discrimination claims against the Social Security Administration constitutes the Commissioner of that agency.  *See Manigault v. Astrue*, No. 1:11-CV-0793-MHS-JFK, 2011 WL 13142464, at *2 (N.D. Ga. Nov. 16, 2011), *report and recommendation adopted*, 2011 WL 13147136 (N.D. Ga. Dec. 6, 2011).  Frank Bisignano assumed that position on May 7, 2025.  *See* https://www.ssa.gov/news/press/releases/2025/#2025-05-07.  Thus, the court substitutes Bisignano as the defendant pursuant to Federal Rule of Civil Procedure 25(d).  *See, e.g., Porterfield v. Saul*, No. 2:17-CV-0939-JEO, 2019 WL 6701974, at *1 n.1 (N.D. Ala. Dec. 9, 2019), *aff'd sub nom. Porterfield v. Soc. Sec. Admin.*, No. 20-10538, 2021 WL 3856035 (11th Cir. Aug. 30, 2021).

[2] Citations to "Doc(s). ___" refer to the document number(s) of the pleadings, motions, orders, and other materials in the court file, as compiled and designated by the Clerk.  Pinpoint citations refer to the page of the electronically filed document in the CM/ECF system, which may not correspond to pagination printed on the "hard copy" of the filed document.

consented to an exercise of plenary jurisdiction by a Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 17). The Agency has moved for summary judgment. (Doc. 44).

For the reasons explained herein, the court will grant the motion in part and deny it in part. Specifically, the court **GRANTS** the motion as to all claims **EXCEPT** Gregerson's Title VII retaliation claims based on (1) the May 16, 2018, verbal reprimand; (2) the November 27, 2018, written reprimand; (3) Gregerson's non-selection for the Thomasville, Georgia Operations Supervisor vacancy; and (4) the retaliatory hostile work environment claim.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

> "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable factfinder could

return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 577 U.S. 1139 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## FACTS

Gregerson began working for the Agency in 1999. (Doc. 55-7 at 1, ¶ 2). She has worked at its field office in Albertville, Alabama, since the early 2000s. Gregerson filed

at least five administrative Equal Employment Opportunity ("EEO") complaints since 2011. (*Id.* at 1-2, ¶ 4; *see also* Doc. 43-59).

She pursued her first formal EEO complaint in 2011.[3] She claimed the Agency retaliated against her in violation of Title VII by refusing to promote her from a Claims Representative position to a Claims Specialist vacancy. Specifically, Gregerson claimed the Agency retaliated because she had testified in support of an EEO complaint by a co-worker alleging sexual harassment. (*See* Doc. 55-7 at 1-2, ¶ 4; Doc. 55-1 at 3-4; Doc. 43-59). In October 2014, an Administrative Law Judge ("ALJ") ruled in Gregerson's favor on her retaliation claim following a hearing. (Doc. 55-1). The ALJ found that Operations Supervisor Melissa Kane had awarded Gregerson a rating of "Recommended," rather than "Highly Recommended," for a Claims Specialist vacancy due to Gregerson's prior EEO activity, and Kane's boss, District Manager Melissa Hill, had "approved" such conduct, resulting in Gregerson's rejection for the vacancy. (*Id.* at 15; *id.* at 19). The ALJ thus directed the Agency to promote Gregerson to a Claims Specialist position, retroactive to 2011. (*Id.* at 19-20; Doc. 55-7 at 1-2). The Agency complied in December 2014 or January 2015. (Doc. 55-7 at 1-2).

Gregerson filed her next EEO complaint in February 2015, claiming the Agency had again failed to promote her in retaliation for EEO activity. (Doc. 43-59 at 2; Doc.

---

[3] Technically, Gregerson filed two EEO complaints on the same day, October 10, 2011, and the Agency later consolidated these complaints. (*See* Doc. 43-59 at 1). For ease of reference, the court will refer to them collectively as "the 2011 EEO complaint."

23 at 6, ¶ 38). On this occasion, she complained the Agency had passed her over for the vacant Operations Supervisor position in Albertville. To fill that post, the Agency selected another employee in the office, Amanda Miller, who thus became Gregerson's supervisor. The parties do not address the outcome of Gregerson's 2015 EEO complaint. The record indicates, however, that Gregerson pursued it to an administrative hearing at which the Agency prevailed. (Doc. 43-59 at 2).

Gregerson filed another formal EEO complaint in 2016. (Doc. 55-7 at 2; Doc. 43-59 at 2). She claimed Hill and Miller retaliated against her via an employee performance review rendered in December 2015.[4] (*Id.*). In particular, Gregerson claimed Miller had initially classified her as a "trainee" in her Claims Specialist position, which Gregerson argued had effectively reduced her review scores. (Doc. 55-7 at 8-9). In addition, Hill had completed Gregerson's review and awarded her a score of a 3 when the average of Gregerson's previous three scores reflected a 4.5 score. (*Id.*). Gregerson contended her prior three reviews as a Claims Representative had averaged "4.5" out of "5," yet the categories on the review form for a trainee allowed a maximum score of only "3." (*Id.*). The Agency normally classifies an employee as a trainee for the first review serving in a new position, yet Gregerson complained the "trainee" label should not apply to her because she assumed the Claims Specialist position retroactive

---

[4] Gregerson also claimed in her 2016 EEO complaint that Hill and Miller had retaliated by awarding Gregerson a "Recommended," rather than "Highly Recommended," rating on some other, unspecified job recommendation. (Doc. 55-7 at 2).

to 2011 pursuant to the ALJ's 2014 order.

Miller relayed Gregerson's complaint to Hill, who agreed to remove the "trainee" tag from Miller's review. (*See* Doc. 55-6 at 160-162, 173-75; Doc. 55-7 at 8-9; Doc. 55-5 at 82-85). Gregerson alleges, however, "management" still only rated her a "3" on the review, which Gregerson claimed was unfair and retaliatory. (*See* Doc. 55-7 at 9). An unidentified individual yelled at Gregerson and informed her management did not "view her as a person who went above and beyond," and the rating "was what [she] deserved." (*Id*). As with the 2015 EEO charge, the parties' briefing does not discuss the outcome of the 2016 EEO complaint. The record indicates, however, the Agency closed it at the administrative process's informal level. (Doc. 44-59 at 2).

Gregerson filed her next EEO complaint in August 2018, alleging the Agency had retaliated against her "since on or about March 2, 2016, and continuing through July 26, 2018." (*See* Doc. 23-1 at 3). She asserted the Agency failed to promote her in 2018 to Operations Supervisor vacancies in Opelika, Alabama; Savannah, Georgia; Thomasville, Georgia; and Charlotte, North Carolina, allegedly because Hill failed to "highly recommend" her for them. (*Id.* at 3-4). In this lawsuit, Gregerson has raised retaliation claims based on her non-selection for those Operations Supervisor vacancies, as well for another one in Charleston, South Carolina.

Gregerson also raised retaliation claims in her 2018 EEO complaint related to a verbal counseling or reprimand and other actions associated with her interactions and problems with another co-worker, Brett Hunter. (*Id.* at 4; *see also* Doc. 55-20). The

7

Albertville office maintained a "Title II unit" and a "Title XVI unit," which refer to corresponding Titles of the Social Security Act.[5]  Gregerson and Hunter both worked in the Title II unit.  Hunter served as the Title II Technical Expert.  In that role, his duties included assisting Claims Specialists, including Gregerson, by reviewing some of their work and answering their technical questions related to Title II claims administration.  (*See* Doc. 55-15 at 42-43; Doc. 43-2 at 5).

Sometime in late April or early May 2018, Gregerson complained about Hunter to Miller, who directly supervised them both.  (Doc. 43-4 at 2).  Gregerson reported Hunter did not assist her appropriately pursuant to his position, principally by putting off her questions and otherwise failing to answer them in a timely fashion.  (Doc. 55-13 at 51-53; Doc. 43-2 at 24; Doc. 43-1 at 2; *id.* at 5; Doc. 55-6 at 52, 74, 83-84).  She had previously lodged similar complaints about Hunter to both Miller and Hill.  (Doc. 55-13 at 51-53; Doc. 55-6 at 52, 76).  Miller described Gregerson on this occasion as more "brash," as she called Hunter "a horrible technical expert" and vowed "she wasn't going back to him anymore."  (Doc. 55-6 at 77).  Miller went to her own supervisor, Hill, and told her about Gregerson's complaint.  (Doc. 55-6 at 74, 84-85).  Hill instructed Miller to meet with Gregerson and Hunter to facilitate a resolution to their

---

[5] *See* 42 U.S.C. § 401 et seq. (Title II); 42 U.S.C. § 1381 et seq. (Title XVI).  "Title II 'provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need.'"  *Smith v. Berryhill*, 587 U.S. 471, 475 (2019) (quoting *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)).  "Title XVI provides supplemental security income benefits 'to financially needy individuals who are aged, blind, or disabled regardless of their insured status.'"  *Id.* (quoting *Galbreath, supra*).

problems.  (Doc. 55-6 at 74, 85-86; Doc. 43-6 at 2).

Subsequently, Miller summoned Hunter and Gregerson into a conference room on May 2, 2018, to facilitate a discussion on the issues Gregerson had raised about working with Hunter.  (Doc. 43-1 at 2, ¶ 5; Doc. 43-2 at 24; Doc. 43-4 at 2, ¶ 9; Doc. 55-13 at 51-53).  At the meeting, Gregerson expressed puzzlement because she deemed her multiple, prior complaints about Hunter as "no big deal," and in fact, she had "no issue" with Hunter.  (Doc. 55-13 at 51-53).  Nevertheless, when Miller asked Gregerson to express how she felt working with Hunter, Gregerson complained about the difficulty performing her work when Hunter would not answer her technical questions.  (*Id.* at 52).

Hunter asserts Gregerson continued providing extended and "intimidating" criticism marked by "heightened emotions and defensive posturing," over the course of the approximately 30-minute meeting on May 2, 2018, and he deemed Gregerson's assertions "irrational" and "baffling."  (Doc. 55-15 at 50-51, 66-67).  Hunter contends Gregerson "really, really showed her butt" in the meeting (*id.* at 51), as she complained Hunter "pisses her off" because she did not like the way he attempts to help her (*id.* at 67), and because he "looked at things too broadly" while she wanted "to specifically pinpoint an issue and get a succinct quick answer."  (Doc. 43-7 at 2; *see also id.* at 2-3).

Miller posits Gregerson told Hunter he was a "horrible technical expert and she was not going back to him, that every time she went to him for help, it took forever to get an answer, and … he always wanted to go down some rabbit hole, and she couldn't

understand why." (Doc. 55-6 at 88-89). Miller declared Hunter "might have been …

a little bit hurt by the words that [Gregerson] used" in the meeting. (*Id.* at 89).

However, Miller did not interpret the discussion between Gregerson and Hunter as

"hostile," and she felt Hunter had taken Gregerson's criticism "in stride," remaining

"calm" and "low-key." (*Id.* at 90). In the immediate wake of the meeting, Miller

believed it had proceeded well and improved the situation between Gregerson and

Hunter.

After the meeting, Hunter believed Gregerson targeted him. (Doc. 43-7 at 3, ¶

11). He heard from others in the office that Gregerson had "talk[ed] badly about [him]

and [his] work, saying that [he] was not present or helpful," which Hunter considered

"bullying." (*Id.*) Hunter also worried his problems with Gregerson placed his job in

jeopardy because she "was going to begin … using [him] as some sort of building block

… for the next bit of litigation that she was going to do." (Doc. 55-15 at 20).

Specifically, Hunter had heard Gregerson talk on multiple occasions about lodging

EEO complaints, and about how the Agency had promoted her as a result of one such

complaint. (*Id.* at 22-26; Doc. 43-7 at 2). He expressed concern that Gregerson would

attack him in a future EEO complaint, perhaps casting him as a scapegoat for what

Hunter saw as Gregerson's own "technical inefficiency." (Doc. 55-15 at 88-89). Hunter

indicates he was "incredibly ignorant" of how the EEO process actually worked. (*Id.*

at 20-21). He believed, however, that, with Gregerson's knowledge of the system, she

may "barge her way into a courtroom" and procure his discharge "through … legal

10

channels." (*Id.* at 57-58; *see also id.* at 90-91). Hunter thus claims he "really, really, really felt worried moving forward." (*Id.* at 13).

Several days after the meeting, Hunter went to Hill and asked to move to a workstation away from Gregerson's because he "wanted the tension from [Gregerson] to decrease." (Doc. 43-7 at 4; Doc. 43-6 at 3). At that time, their workstations situated near each other, with only one station in between. Hunter felt "intimidated" by Gregerson and deemed their relationship "very taxed" because she had uttered negative things about him, managers, and other co-workers. (Doc. 43-7 at 4). Hunter thus requested Hill's approval to move to another workstation because he felt "harassed and bullied" by Gregerson's belittlement of "him and his knowledge." (Doc. 43-6 at 3). Hill approved the request (Doc. 43-6 at 3), and on May 10, 2018, Hunter traded workstations with another employee located on the other side of the office. (Doc. 43-7 at 4; Doc. 43-6 at 3; Doc. 43-1 at 2-3).

Gregerson approached Hill and asked if Hunter's move correlated to the May 2, 2018, meeting. (Doc. 43-1 at 2-3). Hill acknowledged that it did, stating that it "was all about perceptions." (*Id.* at 3).

The next day, May 11, 2018, Gregerson sent an email to Hunter. (Doc. 55-16 at 1). Gregerson wrote that she "hope[d]" his move "had nothing to do with" their May 2, 2018, meeting, and she shared she was "troubled and … gravely disagree[d] with the manner in which management chose to handle th[e] situation." (*Id.*) Gregerson emphasized she truly liked Hunter and did "not believe [him] to be behind any of [the

11

events] intentionally." (*Id.*) She also expressed she was "sorry if for some reason [the events had] affected [him]." (*Id.*) Gregerson closed by offering to present any technical questions via email if doing so would make Hunter feel more "at ease, ... and since management ha[d] lead (sic) us down this path." (*Id.*)

Hunter replied via email on May 17, 2018. (*Id.*). He stated he would not "be involved in any conversation that may undermine management's decisions" or "casts a coworker in a negative light, be it management or otherwise." (Doc. 55-16, at 1). Hunter reassured Gregerson, however, he would "continue to work with [her] in a professional manner when addressing [her] technical needs," and he stated she could ask him questions by email and in person. (*Id.*)

On the prior day, May 16, 2018, Miller met with Gregerson at Hill's direction and delivered a verbal warning/reprimand. (Doc. 43-1 at 4; Doc. 43-4 at 2-3; Doc. 43-6). On May 15, 2018, the day before that meeting, Hill sent an email to Miller containing six bulleted "talking points" she wanted Miller to review with Gregerson in the meeting. (Doc. 55-17). Miller copied and pasted those points onto a sheet of paper that she took into the May 16 meeting. When Gregerson observed Miller with the sheet, she asked for a copy, and Miller gave her one. (*See* Doc. 55-19; Doc. 55-17; Doc. 55-18 at 1-2; Doc. 43-2 at 18; Doc. 43-3 at 121-22). Gregerson and Miller both acknowledge the meeting essentially tracked the bullet points on the sheet. (Doc. 43-2 at 18; Doc. 43-3 at 121-22; Doc. 55-18 at 1-2).

The first bullet point concerned a complaint about an alleged incident with a

12

claimant a year prior. The claimant sought to apply for retirement benefits and disability benefits simultaneously, but the employee with whom he conversed allegedly informed him he could not do so and instructed him he would need a signed statement from his doctor to apply for disability benefits. (*See* Doc. 55-19; Doc. 43-1 at 4; Doc. 43-4 at 3; Doc. 43-6 at 3; Doc. 43-8; Doc. 55-18 at 1; Doc. 55-13 at 34-35). Miller expressed the Agency's determination Gregerson had conversed with the claimant based on information in its system. (Doc. 43-4 at 3; Doc. 55-13 at 35-36). Miller deemed such instructions to the claimant "unacceptable." (Doc. 43-4 at 3; Doc. 55-17; Doc. 55-18 at 1; Doc. 55-19; *see also* Doc. 55-6 at 123-24, 127). Gregerson insisted she did not render any such erroneous instructions to the claimant. (*Id.*; Doc. 43-4 at 4; Doc. 55-18 at 1).

The remaining five bullet points Miller discussed in the May 16, 2018, meeting stemmed from Gregerson's alleged interactions with Hunter and his ensuing complaint to Hill about Gregerson. (*See* Doc. 55-18 at 1-2; Doc. 55-19; Doc. 43-1 at 4; Doc. 43-4 at 3, ¶ 10; Doc. 43-6 at 3, ¶ 9; Doc. 43-8). Those points from Hill stated as follows:

- You need to treat everyone with courtesy and respect. You do not need to talk to co-workers in a negative or berating manner. You do not need to talk about co-workers to other co-workers in a negative or berating manner.

- In the future, should you have issues with an employee you should professionally and respectfully raise your concerns in a non-confrontational way and allow the person the opportunity to address your concerns.

- You should not talk about someone else's intentions or motivations.

- Your conduct in the email to Brett about management is unprofessional and unacceptable. This behavior should cease immediately.

- You should strive to always maintain positive and productive working relationships within the office.

(Doc. 55-19).

Gregerson interpreted the foregoing points as portraying her as "unprofessional with Brett Hunter when [she] was not," and she deemed such criticism "false and inflated." (Doc. 43-2 at 19). Gregerson declared during the May 16, 2018, meeting with Hill that management had handled the situation with Hunter poorly. (Doc. 55-18 at 1). Specifically, Gregerson did not agree management should have convened the "required meeting," as she maintained management should have just talked to Hunter about his failure to perform his duties properly. (*Id.*) Immediately after the May 16 meeting, Gregerson contacted an EEO officer to report Miller had reprimanded her in retaliation for prior EEO activity. (Doc. 55-20).

In July 2018, Patricia "Jeanie" Plummer replaced Miller as Operations Supervisor in Albertville. (Doc. 55-31 at 1; Doc. 43-5; Doc. 43-4; Doc. 43-2). On October 18, 2018, Gregerson arrived to work at approximately 7:00 a.m. after taking medical leave the preceding two days. She immediately experienced problems logging in to her work computer, and she reported the issue to Hill and Plummer. (Doc. 55-31 at 1). Plummer located a spare laptop and gave it to Gregerson. (*Id.*) However, Gregerson continued

14

to experience problems with the computer.  (*Id.*)

At approximately 8:15 a.m., Plummer noticed Gregerson was not present for a meeting of the Title II unit employees.  (Doc. 55-32 at 1; Doc. 55-37 at 3).  Plummer proceeded to Gregerson's cubicle and asked her if she planned to attend the meeting. (Doc. 55-32 at 1; Doc. 55-31 at 1-2).  Gregerson, who did not know of the meeting, asked whether it involved the Title II unit.  (Doc. 55-31, at 1-2).  Plummer answered affirmatively and proceeded back towards the conference room.  (*Id.*; Doc. 43-2 at 20). Gregerson stood up, remarked loudly, "I might as well waste some more time," and began to follow Plummer.  (Doc. 55-31 at 2).  Gregerson asserts she did not direct that remark at Plummer, who, by that point, had walked out of her line of sight.  (Doc. 43-2 at 76; Doc. 55-31 at 2).  Rather, Gregerson asserts she uttered the remark to herself due to the frustrating computer problems and the upcoming appointments that busily occupy her time.  (Doc. 43-2 at 76; Doc. 55-31 at 2).

Nevertheless, Plummer heard Gregerson's remark, and she did not feel happy about it.  According to Gregerson, Plummer had proceeded 15 to 20 feet down the aisle when she quickly turned around and "charged" at Gregerson, "stopping within an inch," whereby they were "literally none to nose, toes to toes."  (Doc. 55-31 at 2). Gregerson alleges Plummer then "rais[ed] her voice" and said, "It's not a waste of time," turned back around, and "stomped to the meeting."  (*Id.*)  Gregerson claims she "was paralyzed with fear and stood . . . silent" as she believed Plummer was "going to hit [her] because of the way she had whipped around and charged at [her]."  (*Id.*)  Gregerson

15

then followed Plummer into the unit meeting, yet she was "so upset and shaking that [she] said little to nothing." (*Id.*)

Shortly after the meeting ended, Gregerson and Plummer separately proceeded to Hill to complain about each other. Gregerson arrived first, at approximately 9:50 a.m., reporting events largely as recited previously. (*See id.* at 2; Doc. 55-33 at 1-2; Doc. 55-34 at 2-3; Doc. 55-35 at 1-2). The report chronicled Plummer's request for Gregerson to attend the unit meeting, Gregerson's remark she "might as well waste some more time," and Plummer's conduct in coming "very close" to Gregerson "in her face." (Doc. 55-33 at 1; Doc. 55-35 at 1). Gregerson also reported Plummer had "assaulted" her. (*See* Doc. 55-33 at 1; Doc. 55-35 at 1; Doc. 55-31 at 2). Hill asked Gregerson to clarify whether Plummer had touched her or lodged any threatening statements. Gregerson stated Plummer had done neither, yet she insisted Plummer had committed an assault because the offense legally requires only a reasonable belief Plummer would strike her. (Doc. 55-33 at 1; Doc. 55-35 at 1, Doc. 55-31 at 2).

After Gregerson left Hill's office, Plummer entered and complained about Gregerson. Plummer claimed Gregerson was "disrespectful to [her] on the floor and was participating in open negativity." (*See* Doc. 55-32 at 1). Plummer recounted her version of events: (1) Gregerson had trouble with her computer; (2) Plummer proceeded to Gregerson's desk to remind her about the unit meeting; (3) Gregerson uttered the "waste some more time" remark; and (4) Plummer declared the meeting did not constitute "not a waste of time" while standing in close proximity to Gregerson.

16

(*Id.* at 1-2).  However, Plummer's account diverged from Gregerson's in the following manner: Plummer said Gregerson lodged the "waste some more time" remark as they both walked down the aisle towards the conference room; upon hearing Gregerson's remark, Plummer stopped and turned around in place to respond; Gregerson "continued to walk into [Plummer's] personal space," which  caused Plummer to feel "intimated," "afraid," and "threatened"; and, Plummer declared "in a softer voice" the unit meeting was "not a waste of time.  (*Id.* at 2).

In an effort to obtain additional information, Hill spoke with another employee, Kelly Epperson.  (Doc. 55-33 at 2).  The incident between Plummer and Gregerson occurred in the aisle near Epperson's cubicle, which situated two stations away from Gregerson's cubicle.  (*Id.*; Doc. 55-36 at 1-2).  Epperson reported Gregerson's frustration with computer problems that morning, and she said "it seemed obvious that she did not want to be at work."  (Doc. 55-33 at 2).  Epperson acknowledged overhearing the exchange between Gregerson and Plummer yet stated she did not observe it.  She confirmed Gregerson had uttered a remark about the unit meeting being a "waste of time," and Plummer had replied it was not.  (*Id.*; Doc. 55-36 at 1-2).  Hill asked Epperson whether Plummer had "raised her voice," and Epperson answered Plummer had not.  (Doc. 55-33 at 2).  Epperson also notes she does "not recall hearing [Plummer] stomp toward [Gregerson]."  (Doc. 55-36 at 2).

Immediately after leaving Hill's office on October 18, 2018, Gregerson requested medical leave, claiming the incident with Plummer triggered her post-traumatic stress

disorder ("PTSD"). (*See* Doc. 55-34 at 3; Doc. 55-35 at 1; Doc. 55-31 at 4). The Agency granted Gregerson leave, and she remained absent the ensuing five weeks. (Doc. 55-31 at 4). While on leave, Gregerson lodged a request on November 5, 2018, to "telework" as a reasonable accommodation for her PTSD disability. (*See* Doc. 57 at 59-60; *see also id.* at 37, ¶ 178). Hill proposed alternative accommodations, including placing a door on Gregerson's cubicle, a tent over it, different lighting, noise cancelling equipment, and a therapy pet. (Doc. 55-31 at 4). Gregerson declined those offers. (*Id.* at 4-5). Gregerson further contends the Agency denied her request to work remotely on March 4, 2019. (Doc. 57 at 60).

On November 27, 2018, the day Gregerson returned from her five-week medical leave, Plummer delivered Gregerson a "Memorandum" with the subject line, "Official Reprimand." (Doc. 55-39). The document served as notice Plummer officially reprimanded Gregerson for two transgressions based on the October 18, 2018, events: "(1) discourteous conduct towards a member of management and (2) conduct unbecoming a government employee by knowingly making a false statement." (*Id.* at 1).

In support of the first charge, Plummer cited Gregerson's remark the unit meeting constituted "a waste of time." (*Id.*) Plummer also alleged Gregerson had "made an implied threat when [she] stepped into [Plummer's] personal space and did not step back," and she had "displayed a belligerent attitude throughout the unit meeting." (*Id.*) The memo further chronicled Gregerson had received "a prior verbal

warning on May 16, 2018, about unprofessional conduct, speaking to a coworker and supervisor in an unprofessional manner." (*Id.*).

Regarding the memorandum's second charge, Plummer alleged Gregerson lodged a false statement to Hill by reporting Plummer had "assaulted" her on October 18, 2018. (*Id.*at 2). Plummer asserted the "false information" stemmed from Gregerson's concession Plummer had neither touched her nor lodged a "verbal threat." (Doc. 55-39, at 2). The memorandum declared the reprimand would remain in Gregerson's personnel file for one year. (*Id.*).

Gregerson also filed an EEO complaint in December 2022 – asserting the Agency retaliated due to prior EEO activity and discriminated against her because of a disability – based on her request to use a space heater. (*See* Doc. 23-3). Regarding these claims, Hill noticed on April 13, 2022, that Gregerson operated a space heater aside her desk. (*See* Doc. 43-40 at 4, 7; Doc. 43-41). The Agency's lease, however, prohibited the use of such devices. (*See* Doc. 43-40 at 2,). Hill therefore sent Gregerson a message stating, "Carrie, if that's a heater, it needs to go home. We can't have them in the office." (*Id.*; *see also* Doc. 43-54 at 3). Gregerson asserts her thyroid cancer condition, and the treatment for it, cause body temperature irregularity. (*Id.* at 3; Doc. 43-54 at 2; Doc. 23 at 28). Gregerson thus replied to Hill, "With my condition, I have to have both a heater and fan at times," and she offered to obtain a note from her physician if needed. (Doc. 43-41).

Before receiving a response from Hill, Gregerson abruptly left the office on

19

medical leave, contending Hill's message triggered her PTSD. (Doc. 43-54 at 2-3, 7). Nevertheless, upon receiving Gregerson's reply to her message, Hill asked Jason Denenny, who had replaced Plummer as Operations Supervisor, to submit a request to the Agency on Gregerson's behalf to use a space heater as a reasonable accommodation for a disability. (*Id.* at 2). Denenny complied that same day. (Doc. 43-42).

Hill also sent the following message to Gregerson that morning: "Hi, Carrie. You left before I had time to get back with you. We can certainly pursue an RA [reasonable accommodation]. Since you've left for the day, I asked Jason to input a[n] RA request in the RA Wizard so that you can provide medical to request to keep your heater and we can look at alternative options as well. Thanks, Melissa." (Doc. 43-41 (footnote added)).[6]

Gregerson asserts she provided medical documentation to Denenny on April 18, 2022, in support of her RA request. (Doc. 43-54 at 4). However, a few weeks later, on May 9, 2022, Denenny emailed Gregerson seeking medical documentation to support her reasonable accommodation request, and he attached a job description for Gregerson's position and a "Disability Accommodation Request and Medical Statement" form to the email. (Doc. 43-43). The record does not indicate Gregerson

---

[6] The "RA Wizard" constitutes an online system for Agency employees to request accommodations for disabilities. (Doc. 43-62 at 4, § 5.3.1). Under the Agency's RA Program, if an employee lodges an accommodation request to their supervisor by another method, the supervisor must enter a request on the employee's behalf in the RA Wizard to ensure the Reasonable Accommodation Process Information and Data System ("RAPIDS"), the Agency's RA tracking system, records the request. (*Id.*).

submitted that completed form to the Agency.

On June 8, 2022, Gregerson responded by giving Denenny a brief note from her oncologist, stating, "Ms. Gregerson may be sensitive to environmental temperatures due to thyroid hormones. We ask that you try to accommodate her needs as per your workplace policy." (Doc. 43-45 at 2; *see also* Doc. 43-54 at 3-4). That same day, Denenny forwarded that note via email to the RA department within the Agency's Regional Office ("RO"), for a medical decision on Gregerson's accommodation request. (Doc. 43-45 at 1-2). On July 5, 2022, an employee from the Alabama Area Director's Office ("ADO") emailed a counterpart to confirm the RO had sent Gregerson's doctor's note to the Agency's Medical Office for analysis. (Doc. 43-47). As it turned out, it had not; thus, the RO forwarded it the next day. (*Id.*).

On August 16, 2022, Hill sent an email to the ADO acknowledging the Medical Office had deemed Gregerson "medically approved" as an "employee with a disability." (Doc. 43-48). Hill then sought direction on approving Gregerson's request for a space heater as a reasonable accommodation despite the building lease's prohibition of such equipment. (*Id.*) That query migrated via email through various representatives within the ADO and RO until it reached Steve Wilkerson, a member of the RO's Field Services Team. (Doc. 43-50 at 1-2).

Subsequently, on or around September 13, 2022, Wilkerson requisitioned the General Services Administration ("GSA"), the main leasing agent for the federal government, *see* 40 U.S.C. § 585; 48 C.F.R. § 570.103, to ask the office landlord to permit

a space heater notwithstanding the terms of the lease. (*Id.* at 1). Having received no response from the GSA, Wilkerson sent a follow up email on October 11, 2022. (*Id.*). The Agency delivered an approved space heater to Gregerson's workspace for her use on October 25, 2022. (Doc. 43-52; Doc. 43-51 at 2; Doc. 43-53 at 2; *see also* Doc. 43-54 at 3). On December 5, 2022, Denenny emailed a letter to Gregerson formally recognizing the Agency had approved her accommodation request for a space heater, noting the prior delivery of such equipment to her in the preceding October. (Doc. 43-53 at 1-2).

## PROCEDURAL HISTORY

On October 5, 2022, the Agency issued a Final Agency Decision denying relief on the claims in Gregerson's 2018 EEO complaint. (Doc. 23-2). Gregerson then filed this action on January 3, 2023, raising claims from that EEO complaint. (*See* Docs. 1, 1-1, 1-2). On June 22, 2023, the Agency issued a Final Agency Decision denying relief on the 2022 EEO complaint. (Doc. 23-4). Gregerson filed an Amended Complaint on July 27, 2023, to add claims related to the 2022 EEO complaint. (Doc. 23).

In her Amended Complaint, Gregerson asserts claims arising under Title VII, the ADA, and the Rehabilitation Act. (*Id.* at 1, "Preliminary Statement"). She pleads those claims in five counts:

- Count I: Title VII Retaliatory Hostile Work Environment

- Count II: Title VII Reprisal

- Count III: Disabilities Interference under the ADA and the Rehabilitation Act

- Count IV: Disabilities Retaliation under the ADA and the Rehabilitation Act

- Count V: Disabilities Failure to Accommodate under the ADA and the Rehabilitation Act.

(Doc. 23).

The Agency moved for summary judgment. (Doc. 44). Gregerson filed a brief in opposition (Doc. 57), and the Agency filed a reply thereto. (Doc. 60). Each side also filed evidentiary submissions. (Doc. 43; Doc. 55).

## DISCUSSION

## I.  GREGERSON'S RETALIATION CLAIMS BASED UPON DISCRETE RETALIATORY ACTS MAY PARTIALLY PROCEED, AND THUS, HER RETALIATORY HOSTILE WORK ENVIRONMENT CLAIM WARRANTS DENIAL OF SUMMARY JUDGMENT.

Gregerson pleaded separate counts alleging the Agency suffers liability under Title VII for retaliation (Doc. 23 at 24, Count I) and "reprisal" (*id.* at 26, Count II). Title VII's principal provision applicable to federal-sector employment states in relevant part that "[a]ll personnel actions affecting employees or applicants for employment ... in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The statute's prohibition against discrimination also engenders protection against retaliation, in which an employer has allegedly subjected an employee to adverse treatment for

engaging in conduct protected under Title VII. *See Rosado v. Secretary, Dep't of the Navy*, 127 F.4th 858, 876 (11ᵗʰ Cir. 2025) (citing *Buckley v. Secretary of the Army*, 97 F.4th 784, 798 (11ᵗʰ Cir. 2024)); *see also generally* 42 U.S.C. § 2000e-3(a) (Title VII's anti-retaliation provision applicable to private sector employment).[7]

Some of Gregerson's retaliation claims assert adverse treatment associated with discrete acts (*see* Doc. 23 at 25, 26, 27, ¶¶ 256, 267, 274, 275, 281), while others seek to recover for a retaliatory "hostile work environment." (*Id.* at 24-26, Count I). The former requires a demonstration that an employer's challenged action constitutes a "personnel action" under § 2000e-16. *See Fortner v. DeJoy*, No. 2:19-CV-01409-NAD, 2022 WL 4591647, at *9 (N.D. Ala. Sept. 29, 2022) (recognizing "that an actionable 'personnel action' … is an essential element of a claim for discrimination or retaliation against a federal employer" (parentheses omitted)), *aff'd sub nom. Fortner v. Brennan*, No. 22-13688, 2023 WL 8813574 (11ᵗʰ Cir. Dec. 20, 2023); *see also Buckley*, 97 F.4th at 799 ("section 2000e-16(a) refers to only 'personnel actions'").

Though Title VII does not define the term "personnel action,' the Supreme

---

[7] Courts and parties sometimes also refer to retaliation claims as claims for "reprisal." *See Balbuena v. McHugh*, No. CV-14-0188-KD-C, 2015 WL 6433258, at *6 n.5 (S.D. Ala. Sept. 24, 2015), *report and recommendation adopted*, 2015 WL 6394514 (S.D. Ala. Oct. 22, 2015); *Perryman v. West*, 949 F. Supp. 815, 818 (M.D. Ala. 1996); https://www.eeoc.gov/laws/guidance/retaliationreprisal-brochure ("Retaliation (a.k.a. 'reprisal') means treating employees badly because they complained about discrimination on the job, filed a discrimination charge or complaint, or participated in any manner in an employment discrimination proceeding."). Gregerson's claims seeking to recover for "retaliation" and "reprisal" thus rest upon the same theory of liability, *i.e.*, that the Agency subjected her to adverse treatment because she engaged in statutorily protected activity. *See Balbuena*, 2015 WL 6433258, at *6 n.5; *Perryman*, 949 F. Supp. at 818.

Court relied upon the Civil Service Reform Act of 1978 for guidance. That Act "broadly defines a 'personnel action' to include most employment related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020) ("*Babb I*") (interpreting parallel language in the Age Discrimination in Employment Act's federal-sector provision, 29 U.S.C. § 633a(a), citing 5 U.S.C. § 2302(a)(2)(A)). In *Buckley*, the Eleventh Circuit deemed claims alleging an employer took discrete "personnel actions" due to a retaliatory motive as "traditional retaliation claims." 97 F.4th at 797-99.

Based upon the foregoing review, the court first addresses Gregerson's "traditional" retaliation claims based on alleged, independently actionable discrete acts.

### A.    Gregerson's Retaliation Claims Based Upon Discrete Retaliatory Acts May Partially Proceed.

In the "Facts" section of her brief in opposition to the Agency's motion for summary judgment, Gregerson outlined a host of events, conversations, and incidents occurring over the course of her more than 20-year career with the Agency. (*See* Doc. 57 at 5-42). Indeed, that section comprises 206 individually numbered statements and consumes more than half of Gregerson's 66-page brief. However, Gregerson fails to discuss or even mention many, if not most, of those alleged facts in the "Argument" section of her brief addressing her claims for relief. (*See id.* at 48-65).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather,

the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Further, a plaintiff does not properly preserve claims at summary judgment merely by reciting conceivably relevant events in a statement of facts without addressing in argument how they support a particular claim or legal theory.  *See Veasy v. Sheriff of Palm Beach Cnty.*, 746 F. App'x 816, 819 (11th Cir. 2018); *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 625-26 (11th Cir. 2007); *Vickery v. Medtronic, Inc.*, 997 F. Supp. 2d 1244, 1253 (S.D. Ala. 2014); *Redd v. United Parcel Serv., Inc.*, No. CV-12-BE-3986-S, 2014 WL 4792234, at *8 n.9 (N.D. Ala. Sept. 24, 2014), *aff'd*, 615 F. App'x 598 (11th Cir. 2015).  Therefore, Gregerson has abandoned any potential claims based on alleged facts that she does not discuss or reference in the argument section of her brief.

Based on a review of Gregerson's summary judgment brief, the court finds that she appears to pursue Title VII retaliation claims based on the following incidents:

> (1) the December 2015 PACS employee review in which Miller initially treated Gregerson as a "trainee" and "yelled" at Gregerson when she complained about the review (*see* Doc. 57 at 50-51; *see also id.* at 11-12, ¶¶ 36-44);

> (2) the meeting with Miller and Hunter on May 2, 2018 (Doc. 57 at 51-54, *see also id.* at 18-19, ¶¶ 67-81);

> (3) the move of Hunter's desk (Doc. 57 at 49-58; *see also id.* at 20-21, ¶¶ 90-96, 100);

> (4) Miller's "verbal warning" on May 16, 2018 (Doc. 57 at 52-58; *see also id.* at 21-26, ¶¶ 103-119);

(5) the denial of promotions to Operations Supervisor positions in Opelika, Savannah, Thomasville, and Charlotte (Doc. 57 at 60-64; *see also id.* at 16, 27-30, ¶¶ 66, 123-141); and

(6) the Plummer "toe-to-toe" incident and "official reprimand" (Doc. 57 at 58-59; *see also id.* at 34-40, ¶¶ 160-195).

Generally, to maintain a § 2000e-16(a) retaliation claim Gregerson must demonstrate a genuine dispute of material fact as to the following elements: (1) she engaged "in an activity Title VII protects;" (2) "she suffered an adverse personnel action"; and (3) retaliation "'played *any* part' in the … decision-making process" that yielded the personnel action. *Buckley*, 97 F.4th at 798 (quoting *Babb I*, 589 U.S. at 406) (emphasis in *Buckley*, brackets omitted)).

The Agency does not contest Gregerson engaged in protected activity. Indeed, she clearly did so by filing EEO complaints, giving testimony, and otherwise participating in EEO investigations into her own complaints and those of other employees. *See Terrell v. Secretary, Dep't of Veterans Aff's*, 98 F.4th 1343, 1355 (11th Cir. 2024); *Taylor v. Wormuth*, No. 5:22-CV-01350-HNJ, 2024 WL 3333034, at *15 (N.D. Ala. July 8, 2024), *appeal dismissed sub nom. Taylor v. Department of the Army*, No. 24-12562-F, 2024 WL 4762925 (11th Cir. Sept. 18, 2024); *see also* 42 U.S.C. § 2000e-3(a) (private-sector anti-retaliation provision of Title VII prohibiting an employer from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII).

As further discussed below, however, the Agency disputes whether certain actions Gregerson challenges as retaliatory might themselves qualify as adverse "personnel actions" under § 2000e-16(a). As noted previously, the Supreme Court recognized that term encompasses "most employment related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb I*, 589 U.S. at 405 (citing 5 U.S.C. § 2302(a)(2)(A)). Furthermore, the prevailing framework queries whether alleged retaliatory conduct "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Babb II*, 992 F.3d at 1207 (quoting *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)).

The Agency also contends Gregerson cannot establish causation. In the federal sector, Title VII claims do not require but-for causation, that is, a showing the adverse action would not have occurred in the absence of the employer's consideration of a protected characteristic or protected activity. *See Babb I*, 589 U.S. at 406-07. Rather, a federal employee "must show only that a protected characteristic [or protected activity] played *any* part in her employer's process in reaching an adverse employment decision." *Buckley*, 97 F.4th at 794 (emphasis in original). Stated differently for the context at bar, a federal employee must establish retaliation constituted "a but-for cause of discrimination – that is, of differential treatment – but not necessarily a but-for cause of a personnel action itself." *Babb II*, 992 F.3d at 1199 (quoting *Babb I*, 589 U.S. at 406).

Therefore, "if retaliation … taints the decision-making process for any personnel action, that violates the federal-sector provision—even if the employer would have

28

made the same decision absent retaliation." *Buckley*, 97 F.4th at 798.  That is, a federal employer violates § 2000e-16(a) when an official accords some weight, but not necessarily decisive weight, to a complainant's protected activity when the official conducts a personnel action.  *See Babb I*, 589 U.S. at 406-07.  Nevertheless, unless the plaintiff can prove protected activity constituted the but-for cause of a challenged act, she may not recover certain kinds of relief vis-à-vis the result of the employment decision, including compensatory damages, backpay, and reinstatement.  *See Babb I*, 589 U.S. at 406, 413-14; *Buckley*, 97 F.4th at 794.

A plaintiff may create a fact issue regarding causation through direct or circumstantial evidence of an employer's unlawful intent.  *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003) (recognizing that "single-motive" and "mixed-motive" discrimination claims can be established with either direct or circumstantial evidence).  "Direct evidence … is evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee, and, if believed, proves the existence of a fact without inference or presumption."  *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (quotations omitted).

Where a federal employee plaintiff seeks to rely on circumstantial evidence of an employer's unlawful intent, she can survive summary judgment by proceeding under

the *McDonnell Douglas*[8] framework. *Rosado*, 127 F.4th at 866. Under that framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation, including: "(1) [the plaintiff] participated in an activity that Title VII protects; (2) she suffered an adverse personnel action; and (3) a causal relationship exists between her protected activity and the adverse personnel action." *Buckley*, 97 F.4th at 798 (citing *Crawford*, 529 F.3d at 970); *see also Rosado*, 127 F.4th at 876. "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks and citation omitted). The foregoing "three elements create a presumption that the adverse action was the product of an intent to retaliate." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)).

Indeed, a prima facie case "raises an inference of [retaliation]… because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furcron*, 843 F.3d at 1312 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981), quoting, in turn, *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Therefore, "*a prima facie case of retaliation defeats summary judgment on a federal employee's claim.*" *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 998 (11th Cir. 2025) (citing *Babb II*, 992 F.3d at 1203) (emphasis added); *see also Rosado*,

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

127 F.4th at 876-77.

Furthermore, while a federal-sector Title VII plaintiff relying on circumstantial evidence can survive summary judgment by resort to the *McDonnell Douglas* framework, she need not do so. *Rosado*, 127 F.4th at 865, 876. Indeed, the Eleventh Circuit maintains the *McDonnell Douglas* framework does not "make sense" in the context of federal-sector Title VII claims. *Babb v. Secretary, Dep't of Veterans Affs.*, No. 23-10383, 2025 WL 1767957 at *6 (11th Cir. June 26, 2025) ("*Babb III*") (citing *Buckley*, 97 F.4th at 794); *see also Buckley*, 97 F.4th at 794-95 ("So using the *McDonnell Douglas* framework for § 2000e-16(a) claims is like requiring the plaintiff to move a boulder when she need only push a pebble—in other words, the burden under *McDonnell Douglas* is heavier than Title *795 VII imposes on a plaintiff in a federal-sector case."); *Babb II*, 992 F.3d at 1204 ("Without quite saying as much, then, it seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the *McDonnell Douglas* framework.'" (quoting *Babb I*, 589 U.S. at 403)).

As explained previously, federal-sector claims only require evidence a protected characteristic or activity played "some part" in an employer's decisional process leading to an adverse action, whereas the *McDonnell Douglas* framework assesses whether a prohibited characteristic or activity constituted the "but-for" cause of an adverse action in a "single-motive" context. *See Buckley*, 97 F.4th at 795; *Rosado*, 127 F.4th at 865-66; *Terrell*, 98 F.4th at 1352; *see also Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (holding the *McDonnell Douglas* framework does not apply in mixed-motive

31

cases, which require a showing discrimination constituted only "a motivating factor" in an employer's decision); *Tonkyro v. Secretary, Dep't of Veterans Aff's*, 995 F.3d 828, 836 (11th Cir. 2021) (perceiving "no material difference" between the "some part" causation standard of *Babb I* and the "motivating-factor" standard applicable to mixed-motive claims).

Hence, courts may apply a "much simpler" approach at the summary judgment stage. *Babb III*, 2025 WL 1767957 at *6 (quoting *Buckley*, 97 F.4th at 795). A court determines whether the record evidence, viewed as a whole, would allow a reasonable jury to find protected activity "played any part" in an employer's decision-making process vis-à-vis a challenged personnel action. *See id.*; *Buckley*, 97 F.4th at 795; *see also Rosado*, 127 F.4th at 865-67 & n.5; *Terrell*, 98 F.4th at 1352.

That approach constitutes a species of the "convincing mosaic" analysis. *See Marshall v. Secretary of the Navy*, No. 24-12910, 2025 WL 1733680, at *3 (11th Cir. June 23, 2025); *Lewis v. Secretary of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at *9 (11th Cir. June 30, 2022); *Troupe v. DeJoy*, 861 F. App'x 291, 294 (11th Cir. 2021); *Taylor*, 2024 WL 3333034, at *10; *see also Quigg*, 814 F.3d at 1240. Thus, even if a plaintiff cannot satisfy the elements of a *McDonnell Douglas* prima facie case, she will "survive summary judgment if [she] present[s] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (en banc) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). That is, circumstantial evidence may form a

"convincing mosaic . . . that would allow a jury to infer intentional discrimination." *Id.* (quoting *Smith*, 644 F.3d at 1328).  Examples of such evidence might include "(1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) [evidence] the employer's justification is pretextual." *Id.* (cleaned up).[9]

Pursuant to the foregoing legal framework, the court considers each of Gregerson's "traditional" retaliation claims.

      1.    <u>Gregerson's Retaliation Claim Based Upon the 2015 "Trainee" Performance Review May Not Proceed, As Gregerson Did Not Adequately Plead the Claim</u>.

Gregerson argues the Agency retaliated against her for prior EEO activity in connection with her December 2015 performance review.  (*See* Doc. 57 at 50-51; *see also id.* at 11-12, ¶¶ 36-44).  She asserts Miller initially classified her as a "trainee" on the review, and doing so effectively limited and reduced her review scores.  Gregerson acknowledges Miller removed the "trainee" designation after she complained, yet Miller retained the same review scores, which Gregerson characterizes as unfair and motivated by retaliatory animus.  Gregerson also claims Miller "yelled" at her after she complained about the review and the inappropriate scores.

---

[9] These principles apply to retaliation claims as well as to discrimination claims.  *See Buckley v. Sec'y of Army,* 97 F.4th 784, 798 (11th Cir. 2024); *Tonkyro v. Sec'y, Dep't of Veterans Affs.,* 995 F.3d 828, 835 (11th Cir. 2021); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

The Agency moves for summary judgment because Gregerson did not properly plead this claim. The Agency further argues that even if Gregerson properly pleaded the claim, the court should dismiss it for failure to exhaust administrative remedies. The Agency also maintains Gregerson cannot demonstrate her prior EEO activity motivated Miller's actions as to the evaluation.

Addressing the Agency's pleading argument, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading must give "fair notice of what the claim is and the grounds upon which it rests," and the complaint must allege "enough facts to state a claim to relief that is plausible on its face," with factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In addition, Federal Rule of Civil Procedure 10(b) provides:

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

*See also generally Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320-23 (11th Cir. 2015) (discussing the types and pitfalls of "shotgun" pleadings).

Gregerson's Amended Complaint includes the following averments related to the performance evaluation at issue:

40. Gregerson's 2015 [employee performance] review should have been completed by October 31, 2015.

41. However, OS [Operations Supervisor] Miller delayed completing the … review until December 15, 2015[,] because she was waiting for the regional office regarding the rating and designation of trainee.

42. OS Miller took 'trainee' off but kept Gregerson's rating at 3.

43. OS Miller yelled at Gregerson during [the evaluation] meeting 'that's all we think you deserved.'

(Doc. 23 at 6-7, ¶¶ 40-43).

However, these four isolated averments appear within the Amended Complaint's 20-page "Factual Allegations" section, which includes some 230 individually numbered statements. (*See id.* at 5-24, ¶¶ 22-251). Further, the Amended Complaint does not allege Miller took any action related to this performance evaluation out of a retaliatory animus or otherwise in violation of Title VII. Finally, neither of the counts in which Gregerson seeks to impose liability under Title VII incorporates these allegations by reference, nor do those counts mention anything about the performance evaluation. (*Id.* at 24-28, Counts I and II). As such, Gregerson's passing reference to a few factual circumstances related to the 2015 evaluation, without asserting a retaliatory motivation or citing Title VII, fails to provide the Agency fair notice of a Title VII retaliation claim based on the evaluation. *See Brown v. Jefferson Cnty. Sheriff's Dep't*, 806 F. App'x 698, 701 (11th Cir. 2020). Although Gregerson further fleshes out and discusses this claim in her summary judgment brief, she may not amend her pleading by doing so. *See Gilmour v.*

35

*Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11ᵗʰ Cir. 2004).[10]

>           2.    Some, But Not All, of Gregerson's Claims Related to Brett Hunter
>                 May Proceed.

Next, Gregerson claims the Agency retaliated against her for prior EEO activity in three ways related to Brett Hunter, each of which she alleges a jury could reasonably conclude constituted either an adverse "personnel action" or a form of retaliatory harassment.  First, Gregerson asserts Miller required her to attend the meeting with Miller and Hunter on May 2, 2018.  Second, Gregerson characterizes the moving of Hunter's desk several days after that meeting as retaliation. Third, Gregerson points to the verbal counseling or warning Miller delivered at the May 16, 2018, meeting.

>           *a.    Gregerson's Claim Related to the May 2, 2018, "Required Meeting"*
>                 *May Not Proceed, as the Meeting Did Not Constitute an Actionable*
>                 *Adverse Action, and There Exists No Evidence of Retaliatory Taint.*

Gregerson asserts the Agency retaliated by requiring her to attend the meeting with Miller and Hunter on May 2, 2018.  However, even assuming the mandatory nature of the meeting, it lasted only approximately 30 minutes, bore an informal nature, and primarily consisted of Miller's efforts to encourage Gregerson and Hunter to discuss how they could improve their working relationship.  Gregerson fails to identify any negative job consequences resulting solely from the requirement to attend the meeting.

---

[10] Nevertheless, even though this performance review cannot form the basis for an independent claim for relief under Title VII, the court may consider evidence related to the performance review in determining whether the record reasonably supports a finding of retaliatory intent on another claim. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Nor does the statute [of limitations] bar an employee from using . . . prior acts as background evidence in support of a timely claim.").

Therefore, a jury could not find that requiring Gregerson's participation constituted a "personnel action," or that it might dissuade a reasonable worker from engaging in protected activity. *See Amaya v. Vilsack*, 754 F. Supp. 3d 1311, 1327 (S.D. Fla. 2024) ("[T]o the extent that … [the plaintiff] had to attend in-person meetings with [her supervisor], … no reasonable jury could find that this common workplace requirement would have dissuaded a reasonable employee from engaging in protected activity").

Nor does the record indicate Miller required the meeting because of Gregerson's prior EEO activity. Rather, Hill and Miller both testified Miller called the meeting at Hill's direction so that Gregerson and Hunter could talk through their work issues due to Gregerson's complaints that Hunter did not effectively perform his job duties as Technical Expert. Gregerson acknowledges she complained to Miller within a few days before the meeting, and she had previously lodged similar complaints about Hunter to both Miller and Hill. Such close temporal proximity between Gregerson's prior complaints and the meeting tends to corroborate Miller and Hunter's facially plausible and legitimate explanation for calling the meeting. *See Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (recognizing that one-week between events suggestive of causation).

The court concludes that requiring Gregerson to attend the May 2, 2018, meeting constituted neither a "personnel action" nor harassment motivated by Gregerson's protected activity. Defendant warrants summary judgment on this claim.

> b. *Gregerson's Claim Related to the Moving of Hunter's Desk May Not Proceed, as the Move Did Not Constitute an Actionable Adverse Action.*

Gregerson also claims the moving of Hunter's desk constituted a retaliatory personnel action or harassment. Again, the court disagrees.

The Agency undisputedly allowed Hunter to move desks at his own request, not on the initiative of Hill, Miller, on anyone else in management. Gregerson argues, however, that Hunter's request to move demonstrated a retaliatory motive, as Hunter knew Gregerson had filed multiple prior EEO complaints, and he feared Gregerson would target him in a future EEO complaint. The court assumes for the sake of argument that such a motivation could represent retaliation.

However, motives aside, Gregerson does not explain how a reasonable worker could characterize Hunter's desk move as anything more than a trifling annoyance. Hunter only moved to the other side of the office floor, and Gregerson could still ask him technical questions as she did before the move. Gregerson speculates other employees in the office may believe Gregerson caused the move. She cites no evidence such speculation bears truth, but even if she could, Title VII does not render actionable everything an employee dislikes. In most cases, courts do not even deem the moving of a *plaintiff's own* workstation materially adverse unless the move imposes a material impediment to the plaintiff's ability to perform their job, or the move implicates a meaningful loss of comfort and prestige. *See Cotton v. Carl Eric Johnson, Inc.*, No. 1:16-CV-72-TWT, 2018 WL 1427938, at *1 (N.D. Ga. Mar. 22, 2018); *Gibson v. Walgreen Co.*,

No. 6:07-CV-1053-ORL-28KRS, 2010 WL 366130, at *11 n.14 (M.D. Fla. Jan. 19, 2010); *Knight v. Computer Scis. Raytheon (CSR)*, No. 6:00-CV-1563-ORL-28DAB, 2002 WL 32818520, at *14 (M.D. Fla. Oct. 25, 2002). As granting Hunter's request to move his desk does not implicate such concerns for Gregerson, the desk move does not constitute a materially adverse action. *See Sanford v. Carter*, No. 2:15-CV-1424, 2018 WL 357323, at *8 (S.D. Ohio Jan. 10, 2018) ("[T]he relocation of [the plaintiff's] coworkers … does not amount to more than a minor annoyance and would not dissuade a reasonable worker from making or supporting a charge of discrimination."). Defendant warrants summary judgment on this claim as well.

> c.    *Jury Questions Exist as to Whether the May 16, 2018, Verbal Warning Constituted an Actionable Personal Action, and Whether Retaliatory Motive Tainted the Decision to Issue the Warning.*

Gregerson also contends retaliation motivated Miller's May 16, 2018, verbal warning or reprimand. Miller counseled Gregerson about harsh remarks she allegedly made to Hunter on May 2 and statements she uttered in an email to Hunter the day after he moved his desk. Miller also addressed the separate matter of a claimant's complaint that Gregerson had incorrectly advised him he could not apply for both disability and retirement benefits at the same time, and he would need a signed doctor's statement to apply for disability benefits.

The Agency seeks summary judgment on this claim on two grounds. First, the Agency contends the May 16 meeting involved only an informal verbal counseling that does not rise to the level of a materially adverse personnel action. Second, the Agency

argues Gregerson cannot prove her prior EEO activity played any part in the decision to give her the counseling.

As alluded previously, the Eleventh Circuit prescribes a "liberal view of what constitutes an adverse employment action" for retaliation claims, pursuant to which an employee must simply demonstrate the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." *Crawford*, 529 F.3d at 974 (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Eleventh Circuit further maintains that "the list of 'personnel actions' includes most employment related decisions, such as work assignments, *disciplinary action*, and *performance reviews*." *Jimenez*, 146 F.4th at 995 n.7 (cleaned up) (emphasis added).

The court concludes a jury could characterize the May 16, 2018, verbal counseling or warning as a personnel action for purposes of § 2000e-16(a), *Babb I*, 589 U.S. at 405, and finds it might dissuade a reasonable employee from engaging in protected activity. *See Burlington Northern*, 548 U.S. at 67-68. Though the Agency argues the meeting resulted in only an informal verbal "counseling," Gregerson argues Miller used the word "reprimand" to characterize the Agency's action during the meeting, which connotes discipline for alleged wrongdoing. Indeed, the Agency treated the action imposed in the meeting as a formal step in its progressive discipline policy, as depicted by Plummer's November 27, 2018, written reprimand against Gregerson that referred to the May 16 action as a disciplinary encounter. Miller also cited Gregerson's

40

alleged misconduct underlying the May 16, 2018, reprimand, including her verbal and email statements to Hunter, as a ground for downgrading Gregerson vis-a-vis recommendations to supervisors seeking information on Gregerson's promotion applications. The occurrence of such discipline might dissuade a reasonable employee from engaging in protected activity. *See Perry v. Rogers*, 627 F. App'x 823, 832 (11th Cir. 2015) (a "written reprimand for tardiness and insubordination … constitute[d] materially adverse action[ ]" for purposes of private sector Title VII retaliation claim); *Kupec v. Austin*, No. 5:22-CV-00966-HNJ, 2023 WL 2087968, at *9 (N.D. Ala. Feb. 17, 2023) ("[M]aterially adverse actions may include … a negative performance review, if it may result in reduced pay, responsibilities, or other benefits)" (citing *Crawford*, 529 F.3d at 974)).

A reasonable jury could also find consideration of Gregerson's protected activity tainted the Agency's decision to issue the May 16, 2018, reprimand. Gregerson does not dispute that her most recent protected activity before the meeting occurred sometime in 2017, at least four-and-a-half months earlier, when she provided testimony in support of another employee's EEO complaint. Those circumstances, standing alone, do not warrant an inference of causation based upon temporal proximity. *See Hitt v. CSX Transp., Inc.*, 116 F.4th 1309, 1317 (11th Cir. 2024) (Though "[t]he burden of causation [as an element of the prima facie case] can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action, . . . mere temporal proximity, without more, must be very close.")

41

(cleaned up).

Even so, Gregerson may create a jury question based upon other evidence tending to show causation, including evidence Defendant engaged in a "pattern of antagonism" following protected activity. *See Jones v. Suburban Propane, Inc.*, 577 F. App'x 951, 955 (11th Cir. 2014) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3rd Cir. 1997)); *see also Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999), *abrogated on other grounds by Lewis v. City of Union City, Ga.,* 918 F.3d 1213 (11th Cir. 2019) (similarly suggesting in dicta that a "pattern of retaliatory activity" may show causation); *see also* Barbara T. Lindemann & Paul Grossman, EMPLOYMENT DISCRIMINATION LAW § 15.IV.D.2 (7th ed. 2023) ("[W]ith a pattern or atmosphere of hostility or animosity in the workplace, or other evidence suggesting retaliation, temporal proximity may strengthen the retaliatory inference, and even a substantial lapse of time may fail to dispel that inference.");[11] EEOC Enforcement Guidance on Retaliation and Related

---

[11] *Citing, George v. Youngstown State Univ.*, 966 F.3d 446, 460-61 (6th Cir. 2020) (9-year gap between employee's lawsuit and termination does not preclude inference of causation where employee was fired almost immediately after terms of parties' settlement agreement expired); *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019) (8-month gap between protected activity and adverse action helped to establish causation based on testimony by supervisor, who admitted transferring plaintiff because of "gender complaint" and better treatment of similarly situated employee); *Stepp v. Covance Cent. Lab. Servs., Inc.*, 931 F.3d 632, 635-36 (7th Cir. 2019) (gap of several weeks between filing of EEOC charge and employer's refusal to make plaintiff permanent employee, combined with evidence of better treatment of comparable coworkers, and employer's proffered reason being "unworthy of credence" sufficient to show causal connection); *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 218-23 (1st Cir. 2016) (4-month gap between complaint and termination, coupled with fact that employer began to collect information on plaintiff's performance only after she complained of sexual harassment, sufficient to establish fact dispute that termination reason may have been pretextual); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) (given seasonal character of her work, female truck driver's retaliation claim should not have been dismissed for failing to plead causal connection between her sexual harassment complaint and employer's failure to rehire her almost 1

year later, given other evidence of retaliatory animus); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 431 (2d Cir. 2016) (where just more than 3 months lapsed between initial protected leave and termination, "[t]he weakness of the evidence supporting the defendant's explanation … would then permit the conclusion that defendants' decision to fire [plaintiff] arose not from her 'abandonment' of her position but from her much-contested attempt to take FMLA leave"); *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013) (circumstantial evidence, consisting of suspicious timing, ambiguous statements by decision makers, and other "bits and pieces of evidence" from which retaliatory motive might be drawn, was sufficient to establish causation); *Heaton v. Weitz Co.*, 534 F.3d 882, 888 (8th Cir. 2008) (jury properly inferred that, although 6 months had passed between protected activity and firing, intervening acts demonstrated retaliatory motive); *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 304 (3d Cir. 2007) (plaintiff's proof that his computer was vandalized, he was excluded from important meeting, and that his supervisor looked at him with disgust established causal link between complaints and adverse action, despite 9-month gap); *Poland v. Chertoff*, 494 F.3d 1174, 1180-81 (9th Cir. 2007) (plaintiff's proof that volume of investigative reports focused on plaintiff increased after she made discrimination claim established causal link between her complaint and adverse actions); *Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 619 (4th Cir. 2007) (plaintiff's evidence that company president said "I'm not going to have any lawsuits on my watch," that vice-president expressed hope that placing plaintiff under supervision would encourage her to resign, and warning to co-worker that if she filed EEOC charge she would "end up like [plaintiff]" sufficient to establish causal link between plaintiff's complaint and her discharge, despite gap of more than 1 year); *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650-51 (4th Cir. 2007) (although 7 months passed between discrimination complaint and termination, plaintiff showed numerous intervening adverse actions, including stripping plaintiff of supervisory responsibilities); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (reversing summary judgment for employer; "[T]he type of evidence that can be considered probative of [a] causal link … is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, [causation can be inferred from] other evidence gleaned from the record as a whole. … '[i]t is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's *prima facie* case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn.'"); *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997) (reversing summary judgment; "pattern of criticism and animosity" by plaintiff's supervisors began shortly after she complained of discrimination); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1996) (2-year period between complaint and discharge not conclusive proof that retaliation did not motivate plaintiff's discharge; "pattern of antagonism" in meantime could lead to finding of retaliation); *Harrison v. Metropolitan Gov't*, 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled on other grounds by Jackson v. Quanex Corp.*, 119 F.3d 647 (6th Cir. 1999) (period of at most 15 months between filing of charge and plaintiff's discharge not too long to defeat causal connection; temporal connection bolstered by evidence that plaintiff's supervisor made repeated comments that suggested he would not hesitate to run employees out of department; evidence of "atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees," both Black and White, although insufficient to establish harassment, supported finding of retaliation); *see also* EEOC Enforcement Guidance on Retaliation and Related Issues, https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (Aug. 25, 2016) (even if time period between protected activity and adverse action is long, employee still may establish retaliation claim if there is other evidence that raises inference of retaliation (such as frequent comments during that period about protected activity)).

Issues, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#_ftnref164 (citing, *inter alia*, *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) ("[T]emporal proximity is not necessary to establish a causal link.https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues - _ftn163 Even when the time between the protected activity and the adverse action is lengthy, other evidence of retaliatory motive may establish the causal link. For example, actions related to the continued processing of a complaint may remind an employer of its pendency or stoke an employer's animus. Moreover, an opportunity to engage in a retaliatory act may not arise right away. In these circumstances, a materially adverse action might occur long after the original protected activity occurs, and retaliatory motive is nevertheless proven.").

In addition to the afore-referenced 2017 protected activity, Gregerson lodged EEO complaints alleging Hill and Miller retaliated against her for protected activity on other occasions. In 2014, an ALJ ruled in Gregerson's favor on a 2011 EEO complaint alleging Hill failed to award Gregerson a "highly recommended" job rating in retaliation for protected activity.

Gregerson filed an EEO complaint in February 2015, claiming the Agency had failed to promote her to the vacant Operations Supervisor position in Albertville in retaliation for EEO activity. Gregerson pursued the complaint to an administrative hearing at which the Agency prevailed.

In 2016, Gregerson also complained that, in December 2015, the Agency

violated the ALJ's 2014 order by treating Gregerson as a "trainee" in her new position on her annual performance review. According to Gregerson, Hill initially awarded her ratings of 3.0 on that review, the highest available for a trainee. Yet management refused, for unknown reasons, to reconsider the scores after the Agency agreed Gregerson should not have received a "trainee" designation, even though exceeding the "trainee" level would have occasioned a higher scoring rubric. Gregerson also alleges an unidentified individual "yelled" at her about the scores, and that person remarked management did not "view her as a person who went above and beyond" and the rating "was what [she] deserved."

The foregoing instances of protected activity charging reprisals could establish a pattern of antagonism, and a reasonable juror could determine an established pattern of antagonism motivated the alleged retaliatory conduct occurring in 2018.

Setting aside the *McDonnell-Douglas* prima facie standard, the record contains evidence of suspicious circumstances indicating the Agency's proffered justification for the May 16, 2018, verbal reprimand disguises a pretext of retaliatory animus, a matter the court may properly consider as part of a convincing mosaic.

First, Hill directed Miller to reprimand Gregerson regarding a customer complaint. Allegedly, Gregerson incorrectly advised the customer he could not apply simultaneously for disability and retirement benefits, and he needed to present a signed statement from his doctor to apply for disability benefits. A jury may reasonably question Hill and Miller's accounts of the reasons they reprimanded Gregerson in May

2018 for that incident.  As an initial matter, Gregerson undisputedly serviced the claimant approximately *one year* prior to the reprimand, a delay that could suggest the Agency fabricated a reason to reprimand Gregerson.  In addition, a discrepancy exists between Miller and Hill's testimony as to the means by which the office received the claimant's complaint about Gregerson.  Miller recounts the customer complained to an unidentified claims specialist, who directed the issue to Hill, who then informed Miller about it.  (*See* Doc. 55-6 at 124-29).  In contrast, Hill recounts *Miller* brought the issue to *her.*  (Doc. 55-4 at 163-65).  Thus, each supervisor alleges she ascertained the customer's complaint from the other.  Miller also recalls reviewing a document chronicling the customer's complaint, yet Miller does not know what happened to it, and no such document appears in the record.

Second, Hill and Miller reprimanded Gregerson over her purportedly unprofessional and abusive statements to Hunter in the May 2, 2018, meeting. However, Gregerson generally denies making any improper remarks to Hunter, and Miller, who attended the meeting while Hill did not, did not characterize Gregerson's statements in the May 2 meeting as "hostile."  To the contrary, Miller believed at the meeting's conclusion that it had helpfully settled the issues between Gregerson and Hunter, indicating Miller did not consider Gregerson's conduct deserving of discipline.

Because the court concludes a jury could reasonably find the May 16, 2018, reprimand constituted a materially adverse action tainted by consideration of Gregerson's protected activity, the court will deny the Agency's motion for summary

judgment on this claim.

>    3.    Defendant Warrants Summary Judgment on Gregerson's
>          Retaliation Claims Related to the Failure to Promote Her to
>          Positions in Opelika, Savannah, and Charlotte, Yet a Jury Question
>          Exists Regarding Whether Retaliatory Intent Tainted the Decision
>          Not to Promote Gregerson to a Position in Thomasville.

Gregerson next seeks to hold the Agency liable for retaliation in connection with its failure to promote her to four Operations Supervisor positions during the spring and early summer of 2018 in Opelika, Alabama; Savannah, Georgia; Thomasville, Georgia; and Charlotte, North Carolina.[12]  Gregerson contends consideration of her prior EEO activity tainted the Agency's selection process for each position.  In so doing, she does not assert Agency managers who ultimately selected the successful candidates retaliated against her.  Those officials managed the local offices where the vacancies existed, and they generally possessed no prior knowledge of Gregerson or her EEO activity when evaluating her application.    Rather, Gregerson claims her own "Albertville Management" retaliated against her at an earlier stage of the process by providing only lukewarm-to-negative recommendations and information in response to reference inquiries from the local Agency managers evaluating the applicants.  (Doc. 57 at 60).

The Agency moves for summary judgment on these claims, arguing that

---

[12] Gregerson also pleaded a retaliation claim based on her non-selection for an Operations Supervisor position in Charleston, South Carolina.  (*See* Doc. 23 at 13, ¶¶ 122-30).  The Agency moved for summary judgment on two grounds: that Gregerson failed to exhaust the claim in administrative proceedings, and that she cannot demonstrate her prior EEO activity played any part in the decision to reject her.  (Doc. 44 at 38-39).  As the Agency highlights, however, Gregerson did not respond to either argument.  (*See* Doc. 60 at 7 n.6).  Indeed, she does not mention the Charleston position anywhere in her summary judgment brief.  A party's failure to oppose arguments lodged in a motion

Gregerson cannot prove her prior EEO activity played any part in her non-selection.

> *a.    Defendant Warrants Summary Judgment on Gregerson's Retaliation Claim Related to the Failure to Promote Her to an Operations Supervisor Position in Opelika, Alabama.*

In March 2018, Gregerson applied for the Opelika Operations Supervisor job, yet the Agency ultimately chose another candidate.  (Doc. 43-11; Doc. 43-12; Doc. 43-16).  Gregerson claims Miller retaliated against her based on prior EEO activity when she completed a candidate questionnaire about Gregerson for the Opelika District Manager conducting the initial evaluation of candidates.  (*See* Doc. 43-14).  Gregerson concedes Miller ultimately rated her as "highly recommended," the most favorable category on the form.  (*Id.* at 3).  However, Gregerson complains that in response to a question whether the candidate experienced "one specific area of weakness concerning promotion potential," Miller answered, "Ms. Gregerson is still working to become technically sound in all aspects of [Title II] processing."  (*Id.* at 2).  The Agency argues Gregerson cannot prove her prior EEO activity played any part in motivating Miller to provide that response.  The court agrees.

Miller completed the questionnaire on May 1, 2018, the day before she held the meeting with Gregerson and Hunter.  (*Id.* at 1).  As discussed, Gregerson's most recent prior EEO activity before that date had occurred sometime in 2017, at least four

---

for summary judgment challenging a claim or issue may constitute an abandonment of the claim or issue.  *See Hammett v. 46 Ent., Inc.*, No. 5:19-CV-01918-HNJ, 2021 WL 5040495, at *10 (N.D. Ala. Oct. 29, 2021).  The court thus concludes Gregerson has abandoned this claim by failing to oppose the Agency's arguments.

months earlier. Gregerson does not point to evidence Miller knew of that protected activity when she completed the questionnaire. Prior to 2017, Gregerson had complained about Miller's 2016 "trainee" review, yet that isolated incident of protected activity adversely implicating Miller occurred too remotely to suggest a causal nexus to Miller's responses on the candidate questionnaire. *See Hitt*, 116 F.4th at 1317.

Gregerson argues Miller "exaggerated [her] technical deficiencies." (Doc. 57 at 60). She also highlights Miller herself worked in Title XVI, not Title II, and Miller acknowledges relying largely on Hill's Title II expertise when assessing Gregerson's Title II technical proficiency. (*See id.* at 48-49; *see also id.* at 11 (citing Doc. 55-5 at 91-92)).

Nevertheless, setting aside the observation that the statement regarding Gregerson's technical proficiency represents somewhat tepid criticism, Gregerson's assertion Miller "exaggerated" her "technical deficiencies" implicitly acknowledges limitation. Most importantly, Miller awarded Gregerson a "Highly Recommended" rating, and Gregerson does not identify any other negative comments in Miller's responses on the form.

The court will grant the Agency's motion for summary judgment on this claim.

> b. *Defendant Warrants Summary Judgment on Gregerson's Retaliation Claim Related to the Failure to Promote Her to an Operations Supervisor Position in Savannah, Georgia.*

On March 26, 2018, Gregerson applied for an Operations Supervisor position in Savannah, Georgia. (Doc. 43-17; 43-18). Savannah District Manager Michelle Wright

performed reference checks of the candidates by calling their supervisors, and she spoke to Miller about Gregerson. (Doc. 43-20 at 1-2). The record does not clearly indicate the date of that conversation, other than it occurred sometime between March 26, 2018, when Gregerson applied, and July 8, 2018, when the Savannah office formally filled the position.[13] (*See* Doc. 43-63). Wright chose another candidate, John Crowley, "primarily because, according to [Crowley's] supervisor and District Manager, he was technically superior in program knowledge." (Doc. 43-20 at 2).

As with the Opelika claim, Gregerson bases this claim on Miller's response to the selecting official's solicitation for a reference. (Doc. 43-20; Doc. 43-21; *see also* Doc. 57 at 29; *id.* at 61-62). Gregerson maintains Miller retaliated by rating her as "recommended" instead of "highly recommended." (Doc. 43-21 at 1). Gregerson also complains Miller downgraded her technical ability, as Miller communicated Gregerson "was still not technical enough to be [rated as] outstanding" in her "knowledge of SSA programs" (*id.*); Miller's "biggest concern" was Gregerson's "technical ability" (*id.* at 4); and Gregerson's "biggest mistake … or problem" involved completing A101s, an automated claims processing method. (*Id.*). When Wright asked for the ratings on each of the four elements of Gregerson's most recent PACS review, Miller said she could

---

[13] Gregerson asserts "the certificate of eligibles indicating the selectee and Gregerson's non-selection was signed *June* 8, 2018." (Doc. 57 at 61 n.7 (emphasis added)). However, she fails to refer the court to an exhibit in the record to support that allegation. (*See id.*) But even assuming the conversation between Wright and Miller took place before that date, rather than July 8, it would not alter the court's analysis.

not remember her "exact scores," but Gregerson "[received] ROC," which corresponds to "Recognition of Contribution," the highest level of performance. (Doc. 43-21 at 1).

This claim fails on essentially the same basis as the prior one: Gregerson does not point to evidence the prior 2015 EEO activity played any part in motivating Miller's responses to Wright's inquiries. Gregerson does not cite any additional evidence that retaliatory animus prompted Miller's remarks acknowledging Gregerson's technical limitations or Miller's failure to recall and provide the "exact scores" from Gregerson's latest review.

Furthermore, Wright's notes indicate Miller largely praised Gregerson's performance:

- Gregerson received the "ROC" award in the prior fiscal year.

- Gregerson had never received discipline.[14]

- She normally gave people a "friendly, helpful" first impression.

- Despite not being "technical enough to be outstanding," Gregerson was "good at automation tools" and "works independently."

- No one ever questioned her integrity.

- Miller trusted Gregerson "to do what she needs to do."

---

[14] Given the May 12, 2018, verbal counseling/warning/reprimand Gregerson received, this response indicates this conversation between Miller and Wright occurred before May 12.

- Gregerson "works . . . well" with others.[15]

- She enjoys her job.

- She exhibited an "agreeable, cooperative, helpful" "attitude towards coworkers and management."[16]

- She was "flexible [and] cooperative."

- Miller described Gregerson's ability to work with others as "well."[17]

- Gregerson unofficially mentored six CSRS.

- Vis-à-vis stress, Miller relied upon Gregerson as "a go to on heavy work days."

- Miller was not aware of Gregerson treating anyone according to personal bias or prejudice.

- Miller described Gregerson's ability to communicate orally as "professional" and tailored to her audience.

- Vis-à-vis the ability to analyze date and solve problems, Gregerson was "really good at looking at info" and she "doesn't have [to] ask TE [Technical Expert} as much.

- Gregerson assumed a mentoring role and trained other employees.

---

[15] Again, another indication the conversation between Miller and Wright occurred before May 12, 2018.

[16] Again, another indication the conversation between Miller and Wright occurred before May 12, 2018.

[17] Again, another indication the conversation between Miller and Wright occurred before May 12, 2018.

- Gregerson worked on multiple eServices projects as a reflection of her creativity.

- Gregerson could multitask and had given speeches.

- Miller deemed Gregerson as dependable and "very" reliable, as "she will open/close office" and only took sick leave for her daughter's pregnancy.

- Gregerson demonstrated initiative as she was "quick to identify need" and "volunteers."

- She takes timely action on work.

- She deals with conflict by "work[ing] on solutions."

- Miller believed Gregerson could "handle anything."

(Doc. 42-21 at 1-4).

No reasonable juror can find Miller harbored a retaliatory animus vis-à-vis Gregerson's candidacy for the Opelika position given the foregoing responses. Indeed, given the May 16, 2018, verbal reprimand Miller delivered to Gregerson, a large portion of the foregoing responses indicates Miller rendered her recommendation before May 16. Hence, the 2015 EEO complaint constituted the most recent complaint Miller had discerned before giving the recommendation, not any activity post-May 16, 2018.

The foregoing circumstances fail to raise an inference of retaliatory intent. The court will grant summary judgment on this claim.

> c.    *A Jury Question Exists Regarding Whether Retaliatory Intent Tainted the Decision Not to Promote Gregerson to an Operations Supervisor Position in Thomasville, Georgia.*

On April 24, 2018, Gregerson applied for an Operations Supervisor position in Thomasville, Georgia. (Doc. 43-22; Doc. 43-23). The selecting official, Thomasville District Manager Jacquelyne Gonzalez, chose Jarrod Majors, an employee within the Thomasville office who received a high recommendation from the outgoing Operations Supervisor. (Doc. 43-24 at 2-3; *see also* Doc. 43-26). Gonzalez declared she reviewed at least two additional applicants who ranked ahead of Gregerson. (Doc. 43-24 at 3-4).

During the selection process, Gonzalez called each applicant's supervisor to obtain reference information and a recommendation, asking each the same set of questions. (*Id.* at 1-2). She spoke to Miller about Gregerson on May 24, 2018. (*See id.* at 2; Doc. 43-25). During that interview, Miller told Gonzalez, among other things, that Gregerson would need to develop "more technical, job knowledge" and she was "still learning her [Title II] work." (Doc. 55-21 at 2). When Gonzalez asked Miller whether she would "be inclined to choose [Gregerson] if found on a strong list of candidates for a similar position in [Miller's] own facility," Miller answered, "yes." (*Id.*) Miller concluded by awarding Gregerson an overall rating of only "recommended," not "highly recommended." (*Id.*) Gregerson argues Miller retaliated by only awarding her a "recommended" rating and by "exaggerat[ing her] technical deficiencies." (Doc. 57 at 60-61).

Unlike the circumstances underlying the Opelika and Savannah vacancies, the record portrays Miller's communication with Gonzalez occurred eight days after Miller verbally reprimanded Gregerson on May 16, 2018. As previously discerned, a

reasonable juror may conclude the May 16 reprimand constituted retaliatory action. The alleged motivation underlying the May 16 reprimand may have also influenced the recommendation rendered on May 24 given the temporal proximity between the events.

Indeed, Miller testified she ultimately believed Gregerson would not perform well as an Operations Supervisor because of the "brash" way Gregerson had spoken to Hunter and her lack of "flexibility" in accepting the way management handled that situation. (Doc. 55-6 at 66-68). However, as discussed previously, Miller also testified she believed Gregerson did not demonstrate hostility during the May 2, 2018, meeting; she believed the meeting had been "helpful;" and prior to Hill's creation of the bulleted list, Miller took no action suggesting she felt Gregerson had acted inappropriately or should receive discipline vis-à-vis the May 2 meeting. In addition, Miller had issued many positive remarks about Gregerson vis-à-vis the Opelika vacancy, which probably occurred before the May 16 meeting pursuant to the analysis in the preceding section.

Gregerson also asserts that Albertville management rated her as "recommended" rather than "highly recommended" in retaliation for her protected activity because they had done so on other occasions, including when she sought the promotions prompting "her 2011 and 2015 formal EEO complaints." (Doc. 57 at 60 (citing Doc. 55-7 at 7-8)). In advancing this contention, Gregerson alludes to other vacancies she failed to secure, which comprised some of the claims in her 2018 EEO complaint but not this lawsuit. (*See id.* (referencing "approximately eleven (11) vacancies" for which she received a rejection without an interview)).

As an example, Gregerson claimed in her 2011 EEO complaint that the Agency retaliated by denying her a promotion to Claims Specialist. (*See* Doc. 55-1 at 18-19). An ALJ found for Gregerson on that claim in October 2014, determining Hill and Melissa Kane, the Albertville Operations Manager before Miller, appraised Gregerson as "recommended" rather than "highly recommended" due to a retaliatory motive. (*Id.*). Gregerson similarly asserts Albertville management refused to assess her as "Highly Recommended" in connection with her "2015 formal EEO complaint[ ]." (Doc. 57 at 60).

In essence, Gregerson contends the alleged retaliatory conduct includes a practice of appraising her as "recommended" rather than "highly recommended" for desired positions, including the Thomasville vacancy. By itself, Gregerson's contention in this regard registers rather weakly. However, in conjunction with the timing of the May 24 conversation on the heels of the May 16 reprimand, her contention buttresses, however slightly, the inference of retaliatory conduct vis-à-vis the Thomasville vacancy recommendation.

Gregerson also casts as retaliatory Miller's response to Gonzalez's query regarding the time gap between Gregerson's assumption of the Claims Specialist position and the commencement of Gregerson's training. Miller responded she could not explain the gap, as she could only confirm Gregerson attended Claims Supervisor training in 2015, and actions prior to that period occurred before she became Gregerson's supervisor. (*See* Doc. 55-22 at 1). A reasonable juror may determine Miller

56

prevaricated on this score because she worked in the Albertville location before she became a supervisor, and it strains credulity she would not have known about Gregerson's work history.  Hence, in conjunction with the other evidence discussed in this section, a reasonable juror could infer Miller's response about the time gap demonstrated retaliatory intent because unexplained gaps in employment history counsel caution for employment decisionmakers.  (Doc. 57 at 64); *see Thomas v. Util. Trailer Mfg. Co.*, 259 F. App'x 233, 235 (11th Cir. 2007) (gaps in an applicant's employment history constituted legitimate, non-discriminatory reason for failing to hire the applicant); *Jacobs v. Personally Yours Servs., Inc.*, No. 1:07-CV-2812-WSD-RGV, 2008 WL 11335152, at *8 (N.D. Ga. Dec. 16, 2008), *report and recommendation adopted,* No. 1:07-CV-2812-WSD, 2009 WL 10669419 (N.D. Ga. Jan. 22, 2009) (no inference of retaliation arose when employer rejected the plaintiff's application because "her employment history contained several unexplained gaps," not because of a negative reference she received).

In summary, a material fact dispute exists whether the Agency's consideration of Gregerson's protected activity tainted the process of her application for a promotion to the Thomasville position.  Accordingly, the court denies summary judgment on this claim.

> d.      *Defendant Warrants Summary Judgment on Gregerson's Retaliation Claim Related to the Failure to Promote Her to an Operations Supervisor Position in Charlotte, North Carolina.*

On May 22, 2018, Gregerson applied for a Charlotte, North Carolina, Operations

Supervisor position.  Charlotte District Manager Vernal Cooper sent recommendation forms to the applicant's supervisors, and on June 28, 2018, Miller completed a form for Gregerson.  (Doc. 43-33).  Miller appraised Gregerson as "Recommended" rather than "Highly Recommended," and she declared she would not select Gregerson if she had one vacant OS position to fill.  (*Id.* at 1, 4).  In addition, Miller downgraded Gregerson based on the issues with Hunter when assessing her "weak points."  (*Id.*)  Miller remarked, "when asked to sit down and hold discussions to try and reach a workable solution related to her own perceptions of the training she is receiving from her unit technical expert, [Gregerson] appeared unwilling to be a team player and seek a workable solution."  (*Id.*)  Finally, Miller rated Gregerson as a "0" on a scale from 0-5, reflecting "No basis for judgment," in several categories, and only a "2" in several others, reflecting a rating of only "Satisfactory."  (*Id.* at 1-4).

Cooper acknowledges the management team overseeing the Charlotte vacancy received the recommendation forms from the applicants' various supervisors.  (Doc. 43-32 at 1).  He asserts, however, that the management team did not review those forms, talk to any of the supervisors who submitted them, or further consider any of those applicants.  (*Id.* at 1-2).  Rather, shortly after he received the returned forms, the management team received a hardship transfer request from the Area Director's office, whereby a supervisor in another office asked for placement in the Charlotte position because her husband had taken a job in the area.  (*Id.*).  Before reviewing the recommendation forms for the other applicants, Cooper and the management team

decided the Agency should grant the hardship transfer request, and he sent a selection certificate to the Area Office for authorization to do so.  (*Id.* at 2).  The Area Office approved, and the hardship candidate filled the position.  (*Id.*).

Gregerson does not identify any evidence disputing that the management team overseeing the Charlotte vacancy did not review the submitted supervisor questionnaires.  Gregerson also does not argue that the selecting officials for the Charlotte position harbored a retaliatory bias against her or even knew of her protected activity.  Therefore, assuming Miller's responses and recommendation on the form reflect a retaliatory bias, the evidence establishing that the decisionmakers filled the vacancy with the hardship transfer candidate without reviewing Miller's form establishes that any bias on Miller's part did not taint the decision-making process.  *See Buckley*, 97 F.4th at 794 (ruling a federal employee "must show only that a protected characteristic [or protected activity] played *any* part in her employer's process in reaching an adverse employment decision") (emphasis in original); *id.* at 798 (remarking "if retaliation … taints the decision-making process for any personnel action, that violates the federal-sector provision—even if the employer would have made the same decision absent retaliation."); *Babb I*, 589 U.S. at 408 n.3 (recognizing that if a subordinate were to recommend employee A for a promotion based in part on employee B's age, but the "decision-maker rebukes this subordinate for taking age into account, disregards the recommendation, and makes the decision independently," then "age played no role whatsoever in the ultimate decision").

59

For these reasons, the court will grant summary judgment on the claim for the Charlotte position.

4.  <u>Defendant Warrants Summary Judgment on Any Retaliation Claim Based Directly Upon the October 18, 2018, "Toe-to-Toe" Incident Between Gregerson and Plummer, Yet a Jury Question Prevents Summary Judgment on Any Retaliation Claim Based Upon the Official Reprimand Gregerson Received on November 27, 2018.</u>

Gregerson claims she suffered retaliation over the "toe-to-toe" incident with Plummer on October 18, 2018, which resulted in a written, "official reprimand" from Plummer on November 27, 2018. (*See* Doc. 57 at 58-59).

As to the "toe-to-toe" incident itself, no reasonable juror may find the incident stemmed from Gregerson's prior EEO activity. Gregerson admits she failed to appear on time for the Title II unit meeting, and she uttered in Plummer's presence that the meeting would constitute a "waste of time." No evidence suggests the alleged confrontation stemmed from anything other than Plummer's construal of Gregerson's remark.

Gregerson contends, however, the Agency unlawfully retaliated when Plummer issued a written reprimand on November 27, 2018, after the toe-to-toe incident. As an initial matter, disputable issues of fact exist as to whether the November 27, 2018, written reprimand qualified as a personnel action and whether it might dissuade a reasonable employee from engaging in protected activity for essentially the reasons discussed as to the May 16, 2018, verbal reprimand. Indeed, the written reprimand represented a further formal step in the Agency's progressive discipline policy, building

60

on the May16, 2018, verbal reprimand.

More pertinently, there exists a disputed issue of fact as to whether consideration of Gregerson's prior EEO activity tainted the Agency's decision to issue the written reprimand. Plummer admits that when she considered potential discipline against Gregerson in the wake of the October 18, 2018, incident, Hill informed Plummer about Gregerson's prior EEO activity. (Doc. 55-37 at 5). Plummer then delivered the written reprimand memo to Gregerson just a few weeks later, when Gregerson returned from medical leave on November 27, 2018.

The record also contains evidence contrasting Plummer and Hill's chronicle of Gregerson's alleged misconduct that formed the basis for the reprimand. The court may consider such contrasting evidence as evincing a convincing mosaic of retaliatory intent.

Specifically, Plummer's reprimand lodged two charges against Gregerson: (1) displaying "discourteous conduct" and (2) "making a false statement" to Hill about the incident. (Doc. 55-39 at 1). Plummer based the former charge on three items: Gregerson's "waste of time" comment; Gregerson's "implied threat when [she] stepped into [Plummer's] personal space and did not step back"; and Gregerson's allegedly "belligerent attitude throughout the unit meeting." (*Id.* at 1). Plummer based the second charge on an allegation Gregerson had falsely accused Plummer of assault. (*Id.* at 2). Though Gregerson does not dispute uttering the "waste of time" remark, a reasonable jury may find Plummer knew Gregerson did not engage in any of the other

alleged actions when Plummer issued the reprimand.

First, a material discrepancy exists between Plummer's account of the toe-to-toe incident and Gregerson's. Both individuals acknowledge Gregerson uttered the "waste some time" remark. However, Plummer maintains that after Gregerson's comment, Plummer stopped in place and turned around, and Gregerson effected an "implied threat" by walking into and remaining in Plummer's close personal space. Gregerson denies that version of events: she contends Plummer "charged" towards her, stopped inches from her face, and angrily stated in a "raised" voice that the meeting would not constitute a waste of time, leading Gregerson to fear Plummer would strike her. At this stage, the court must credit Gregerson's version of those underlying events. Moreover, due to Plummer's presence during those events, the court must further assume Plummer knew the accuracy of Gregerson's account, yet she persisted in rendering a contrasting accusation.

Evidence also exists Plummer falsely charged Gregerson with "display[ing] a belligerent attitude throughout the unit meeting." (*Id.*). "Belligerent" commonly means "exhibiting assertiveness, hostility, or combativeness." https://www.merriam-webster.com/dictionary/belligerent. Gregerson denies exhibiting such an attitude, claiming she felt upset and shaken by the toe-to-toe incident, and she "said little to nothing" during the unit meeting. (Doc. 43-38 at 2). Plummer essentially confirms that characterization of events, acknowledging Gregerson "never said a word during the meeting," and noting that when Plummer asked her for input, Gregerson just

"shrugged her shoulders and said nothing that [Plummer could] recall." (Doc. 55-37 at 3). Hill also attended the unit meeting, and she also indicated she would not describe Gregerson's behavior as "belligerent." (Doc. 55-33 at 3-4).

Finally, a jury could reasonably find Hill and Plummer knew they falsely accused Gregerson of rendering a "false statement." That charge stemmed from Gregerson's report to Hill that Plummer "assaulted" her during the toe-to-toe incident. As explained, Gregerson's claim that Plummer assaulted her rests upon Gregerson's allegation that Plummer angrily charged at her and advanced within inches of Gregerson's face, such that Gregerson believed Plummer would strike her.

Plummer's reprimand charges Gregerson "knowingly supplied false information" because she reported the incident as an "assault" despite knowing Plummer did not touch her or issue a verbal threat. (Doc. 55-39 at 1-2). However, when Gregerson reported the incident, she specifically advised Hill she used the "legal definition" of "assault," which Gregerson explained did not require physical contact. (Doc. 55-4 at 151-52; *see also* Doc. 43-38 at 2).

Viewed in the light most favorable to Gregerson, Plummer's alleged conduct may have qualified as an assault. "Under Alabama law, an assault consists of 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Peterson v. BMI Refractories*, 132 F.3d 1405,

1412-13 (11th Cir. 1998) (quoting *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990)); *see also Gooden v. Mormon*, 524 F. App'x 593, 597 (11th Cir. 2013) ("[A]ssault, simple or aggravated, does not require physical contact or harm, but rather the *apprehension* of harm . . . ." (quoting *Mathis v. State*, S.E. 2d 856, 859 (Ga. Ct. App. 1987) (emphasis in original))).

Thus, the prevailing law supports Gregerson's interpretation of Plummer's alleged conduct.  Furthermore, Gregerson clearly expressed to Hill her belief the toe-to-toe incident occasioned an assault by Plummer.  Therefore, a reasonable jury may consider this feature of the discipline as evidence Hill and Plummer engaged in retaliation by reprimanding Gregerson for uttering a false statement that was largely accurate.

Because the evidence presents a convincing mosaic of circumstantial evidence indicating consideration of Gregerson's prior EEO activity tainted Hill's and Plummer's decision to issue the written reprimand, the court will deny summary judgment on this claim.

**B.    Gregerson's Retaliatory Harassment Claim Warrants Denial of Summary Judgment for Essentially the Same Reasons Vis-à-vis Denial of Summary Judgment for the Title VII Retaliation Claim Regarding Certain Discrete Acts.**

Gregerson also seeks to hold the Agency liable under Title VII based on a retaliatory hostile work environment theory.  (Doc. 23, Count I).  To prevail, Gregerson would have to prove that, "to retaliate against her for engaging in protected Title VII

activity, her employer created or tolerated a work environment that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination' and that environment rose to the level of a 'personnel action.'" *Buckley*, 97 F.4th at 799 (quoting *Babb II*, 992 F.3d at 1207-09). Moreover, as countenanced previously "retaliation for engaging in protected conduct must not 'play any part' in any federal personnel action." *Id.* at 876 (citing *Babb I*, 589 U.S. at 406–07; *Babb II*, 992 F.3d at 1202). "So . . . a federal employee need not show that retaliation was the but-for reason" for the alleged harassment. *Id.* (citing *Buckley*, 97 F.4th at 798). "Rather, it's enough to establish that retaliation somehow figured into" the environment experienced by the aggrieved employee. *Id.* (citing *Buckley*, 97 F.4th at 798).

Furthermore, hostile work environment claims rest upon a theory an employer engaged in or permitted harassing conduct that warrants legal action because the conduct created a hostile or abusive working environment, even if constituent incidents may not support recovery when considered in isolation. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002), *superseded in part by statute*, Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2, 123 Stat. 5 (2009). Section 2000e-16(a) permits hostile environment claims based on retaliatory harassment motivated by a complainant's protected activity. *See Buckley*, 97 F.4th at 798-800. The Eleventh Circuit has consistently analyzed retaliation claims seeking to recover for discrete acts separately from claims for a hostile work environment, including in federal-sector cases. *See, e.g., Terrell*, 98 F.4th at 1354-57; *Buckley*, 97 F.4th at 797-800; *Tonkyro*, 995 F.3d at 833-37.

Nevertheless, because "section 2000e-16(a) refers to only '"personnel actions,' . . . a claim for retaliatory hostile work environment" must demonstrate the "environment rose to the level of a 'personnel action.'" *Buckley*, 97 F.4th at 799 (citing *Babb II*, 992 F.3d at 1207-09); *see also Babb II*, 992 F.3d at 1209 ("The text of the federal-sector provision addresses 'personnel actions,' and so it seems clear enough that an actionable retaliatory-hostile-work-environment claim must describe conduct that rises to that level.").

Hence, hostile work environment claims may emanate from discrete acts that, on their own, would not warrant judicial relief. *See Gowski v. Peake*, 682 F.3d 1299, 1312-13 (11th Cir. 2012) (recognizing that while "discrete acts cannot alone form the basis of a hostile work environment claim … the jury could consider discrete acts as part of [such a] claim"), *overruled on other grounds as recognized in Babb II,* 992 F.3d at 1206-09; *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim."); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004) (recognizing "hostile environment claims" may be based on "harassment that 'culminates in a tangible employment action'" (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998))).

Nevertheless, adverse treatment only "counts" towards a retaliatory hostile

environment when the employee's protected activity motivates it. *See Buckley*, 97 F.4th at 797-800; *Tonkyro*, 995 F.3d at 837; *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012). Accordingly, to the extent a plaintiff claims an employer bears liability for a retaliatory hostile work environment based on adverse treatment that includes individual discrete acts, a court must determine whether evidence indicates protected activity motivated those individual acts.

Gregerson's discussion of events in the argument section of her brief does not analytically distinguish between individual, traditional retaliation claims and her retaliatory hostile work environment claim. As such, Gregerson's retaliatory harassment claims overlap with discrete retaliation claims.

Nevertheless, the retaliatory harassment claim constitutes a cause of action distinct from the retaliation claim based upon discrete acts. As referenced previously, the "very nature" of hostile work environment claims "involves repeated conduct," unlike Title VII retaliation claims, which are based on discrete acts. *Morgan*, 536 U.S. at 115. That is, a hostile work environment emanates from the "cumulative effect of individual acts," each of which "may not be actionable on its own." *Id.* And at the least, a Title VII, federal-sector hostile work environment claim constitutes any environment comprised of personnel actions that 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.' *C.f.*, *Babb II*, 992 F.3d at 1206 (describing the standard for evaluating private-sector, hostile-work-environment claims as "whether a reasonable jury could find that 'the actions

complained of were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action'" (citation omitted)). Therefore, the assessment of the discrete retaliation claims in the preceding sections impacts the retaliatory harassment claim.

For the reasons explained previously, material fact issues warrant jury consideration of Gregerson's Title VII retaliation claims based on the (1) May 16, 2018, verbal reprimand, (2) the November 27, 2018, written reprimand, and (3) her non-selection for the Thomasville, Georgia, Operations Supervisor vacancy. That is, a material issue of fact remains as to whether each of those discrete acts resulted from a retaliatory motive that played any part in the decisional process for those personnel actions, and whether such conduct 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'

Resultingly, because the afore-listed discrete acts underlying Gregerson's Title VII retaliation claim satisfied the 'play any part' and 'might have dissuaded' standards for summary judgment purposes, the cumulative effect of these acts also satisfies the standard for the purposes of Gregerson's retaliatory harassment claim at this stage, particularly given the fact they transpired over a six-month period. In addition, the other discrete acts examined in the preceding sections may also bear upon the retaliatory harassment claim, notwithstanding the finding they did not warrant consideration as individual, discrete acts of retaliation.

Therefore, for essentially the same reasons the court denied summary judgment

as to Gregerson's Title VII retaliation claim for discrete acts, the retaliatory harassment claim warrants denial of summary judgment.

## II.    DEFENDANT WARRANTS SUMMARY JUDGMENT ON GREGERSON'S CLAIMS FOR DISABILITY DISCRIMINATION UNDER THE ADA AND THE REHABILITATION ACT.

Gregerson also alleges the Agency violated her rights under both the ADA and the Rehabilitation Act. (*See* Doc. 23, Counts III, IV, and V). The ADA bars employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Rehabilitation Act prohibits federal agencies from engaging in employment discrimination against otherwise qualified individuals with a disability. *See* 29 U.S.C. § 794(a); *Mullin v. Secretary, U.S. Dep't of Veterans Affs.*, 149 F.4th 1244, 1250(11th Cir. 2025) (citing *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)).

The ADA does not apply to federal employees. *Jimenez*, 146 F.4th at 1001 n.11; *Garrett v. Postmaster Gen. United States Postal Servs.*, 725 F. App'x 782, 784 (11th Cir. 2018). Accordingly, the court will dismiss Gregerson's claims to the extent they rely upon the ADA. Nevertheless, Gregerson's claims under the Rehabilitation Act proceed under the same standards of liability as ADA claims. *See Mullin*, 149 F. 4th at 1251; *Jimenez; Garrett, supra.*

Some of the 206 individually numbered statements in the "Facts" section of Gregerson's summary judgment brief may relate to claims alleging unlawful disability discrimination. However, to the extent Gregerson has not discussed or referenced

such facts in her legal arguments in an effort to tie them to particular claims for relief, she has abandoned any potential claims based on those facts.  *See Veasy*, 746 F. App'x at 819; *McIntyre*, 251 F. App'x at 625-26; *Vickery*, 997 F. Supp. 2d at 1253; *Redd*, 2014 WL 4792234, at *8 n.9.  Rather, the court finds Gregerson continues to press disability discrimination claims based on only:  (1) her November 5, 2018, request to telework as a reasonable accommodation of her PTSD (*see* Doc. 57 at 59-60); and (2) the Agency's delay in processing her April 13, 2022, request to use a space heater as a reasonable accommodation of a disability.  (*Id.* at 64-65).

### A.   Defendant Warrants Summary Judgment on Gregerson's Claims Based Upon a Request to Telework in November 2018 as Gregerson Failed to Exhaust Her Administrative Remedies for that Claim.

Gregerson claims the Agency engaged in disability discrimination as to her November 5, 2018, request to telework as a reasonable accommodation for her PTSD.  (Doc. 57 at 59-60).  She further asserts Hill proposed unworkable alternatives that suggested a refusal to engage in good faith in an interactive process, and she complains the Agency unduly delayed in formally denying her request until March 4, 2019.  (*Id.* at 60).

The court assumes Gregerson sufficiently pleaded this claim, although the matter does not present with absolute certainty.[18]   However, Gregerson failed to

---

[18] The "Facts" section of the Amended Complaint includes nine numbered allegations outlining the circumstances of this claim.  (*See* Doc. 23 at 19, ¶¶ 185-193).  Namely, Gregerson alleges she requested to telework as a reasonable accommodation for PTSD on October 29, 2018; the Agency failed to

exhaust administrative remedies as to this claim.

Before bringing a cause of action under the Rehabilitation Act, a federal employee must exhaust administrative remedies.  *See Jimenez,* 2025 WL 2025523, at *5; *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008); *Doe v. Garrett*, 903 F.2d 1455, 1461 (11th Cir. 1990).  As one of those administrative measures, an employee must present the claim to the pertinent federal agency in an EEO complaint within 45 days of the allegedly unlawful discriminatory act.  *See Jimenez, supra.*  Gregerson does not allege, and the record does not otherwise disclose, she ever raised this claim in an EEO complaint. (*See* Doc. 23 at 2-5 ¶¶ 5-21; Docs. 23-1, 23-2, 23-3, and 23-4).  Accordingly, the court will grant summary judgment in Defendant's favor as to this claim due to Gregerson's failure to exhaust administrative remedies.

**B.    Defendant Warrants Summary Judgment on Gregerson's Claims for Denial of a Reasonable Accommodation, as Defendant Did Not Unreasonably Delay in Granting the Request**.

Gregerson also claims the Agency unlawfully discriminated in connection with

---

engage in the interactive process in good faith; and the Agency constructively denied the request.  (*Id.*) While Gregerson's summary judgment brief identifies the date of the request as November 5, 2018, such a discrepancy does not make a material difference.  However, the location of those allegations in the middle of 230 individually numbered statements within the 20-page "Facts" section of the pleading obscures their significance. (*Id.* at 5-24, ¶¶ 22-251).  That section of the pleading also does not cite the ADA or the Rehabilitation Act.  Likewise, the counts that assert claims for disability discrimination neither incorporate any prior factual allegations by reference nor mention anything about PTSD or telework.  (*See* Doc. 23, Counts Three, Four, and Five).  Questions thus arise whether the Amended Complaint provides "fair notice of what the claim is and the grounds upon which it rests," *Bell Atlantic Twombly*, 550 U.S. 544, 555 (2007), and whether the Amended Complaint states each claim founded on a separate transaction or occurrence in a separate count, as Federal Rule of Civil Procedure 10(b) requires.

71

her request to use a space heater as a reasonable accommodation for a disability arising from her thyroid cancer diagnosis and treatment.  (Doc. 57 at 64-65; *see also id.* at 41-42, ¶¶ 201-205).  An employer unlawfully discriminates under the Rehabilitation Act by refusing to provide a reasonable accommodation of a disability.  *See Mullin,* 149 F. 4th at 1251.  An unlawful denial may present as actual or constructive, based upon an unreasonable delay in approving a valid request.  *See id.* at 1255; *Hill v. Clayton Cnty. Sch. Dist.*, 619 F. App'x 916, 921-22 (11th Cir. 2015); *see also Terrell v. USAir*, 132 F.3d 621, 627-28 (11th Cir. 1998).  Gregerson asserts a constructive denial: even though the Agency ultimately approved her April 13, 2022, request for a space heater by delivering a space heater to Gregerson's workspace on October 25, 2022, and provided a written notice formally approving the request on December 5, 2022, Gregerson argues the Agency unreasonably delayed in approving the request.

"In assessing claims of unreasonable delay, courts consider 'the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.'"  *Mullin*, 149 F. 4th at 1259 (quoting *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1262-63 (10th Cir. 2001)); *accord McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) ("Whether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the

accommodation requested, and whether the employer offered alternative accommodations.").

The Agency delayed just over six months—from April 13, 2022, to October 25, 2022—in granting Gregerson's request.[19]   Courts have held that similar, and even longer, delays do not evince unreasonableness as a matter of law because there exists no evidence the employer acted in bad faith, and the employee continued performing her job during the delay without any particular claimed disruption or penalty.  *See Jackson v. Secretary of Dep't of Veterans Affs.*, No. 8:17-CV-1673-T-36TGW, 2019 WL 13273394, at *7 (M.D. Fla. Aug. 2, 2019) ("Jackson still fails to provide facts in support of his assertion that a six-month delay in receiving the requested accommodation, an ergonomic desk that would allow him to stand as he typed, was unreasonable.  … Critically, Jackson also does not connect the six-month delay with any harm."); *Hartsfield v. Miami-Dade County*, 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (delay of almost ten months in providing closed circuit television device for reading documents did not constitute failure to accommodate under ADA), *aff'd sub nom. Hartsfield v. Miami Dade Cty.*, 248 F.3d 1179 (11th Cir. 2001) (table); *see also Luke v. Board of Trustees Fla. A&M Univ.*, 674 F. App'x 847, 849 (11th Cir. 2016) (employee failed to demonstrate delay in

---

[19] Gregerson highlights she did not receive a formal written notice approving her request until December 5, 2022.  However, the Agency's delivery of a space heater to Gregerson's work area itself reasonably implied approval to use the heater, and she does not claim the Agency restricted its use.  A jury could not reasonably conclude any delay persisted after October 25, 2022.  *See Terrell v. USAir*, 132 F.3d 621, 628 (11th Cir. 1998) (excluding the time the plaintiff was on unrelated medical leave from the delay period; "The only delay we consider is the time that Plaintiff was working at USAir without the drop keyboard [accommodation].").

approving police officer's requests for a jumpsuit and a shoulder holster manifested as unreasonable where officer "testified that she was not rendered unable to work as a result of the delays."); *Hill*, 619 F. App'x at 922 (distinguishing cases holding that delays manifested as reasonable as a matter of law "because the plaintiff[s in those other cases] continued working (presumably for pay) in each"); *Swain v. Wormuth*, 41 F.3d 892, 898 (7th Cir. 2022) (the Army's approximate 20-month delay in installing door openers for civilian employee did not render accommodation of employee's disability unreasonable, where the plaintiff needed to fill out paperwork, and the Army needed to review it and then inspect, order, and install doors, with each step taking a few months).

Gregerson asserts "it is evident that [Hill] delayed the processing of [her request for a space heater], without a legitimate basis." (Doc. 57 at 65). Indeed, Gregerson suggests Hill intentionally delayed the process due to prohibited animus related to Gregerson's disability or some activity protected under Title VII or the Rehabilitation Act. However, Gregerson fails to identify evidence Hill or anyone else at the Agency acted in bad faith while processing Gregerson's accommodation request. Rather, when Gregerson claimed to need a space heater because of her unspecified condition on April 13, 2022, Hill immediately informed Gregerson she had tasked the Albertville Operations Supervisor, Jason Denenny, with commencing the process for the Agency to deem the request as seeking a reasonable accommodation of a disability. Denenny opened that accommodation request on Gregerson's behalf the same day. (Doc. 43-46).

74

Likewise, Gregerson bore responsibility for approximately the first two months of delay. Hill's initial response on April 13, 2022, indicated Gregerson needed to submit medical documentation. On May 9, 2022, Denenny expressly asked Gregerson to provide medical information to support her request, and he provided her with a form for her physician's completion. Gregerson responded to Denenny's request a month later, on June 8, 2022. Even then, she did not return the form Denenny provided. Rather, she provided a note from her physician stating she "may be sensitive to environmental temperatures due to thyroid hormones" and asking generally for the Agency "to accommodate her needs." (Doc. 43-45 at 2).

Gregerson argues that any request for medical documentation following her accommodation request constituted bad faith because Hill already knew she suffered from thyroid cancer and underwent treatment in late 2020. But even if Hill had such knowledge, an employer engaging in the interactive process generally may request an employee to submit medical documentation to support the existence of a disability and the necessity for a requested accommodation. *See Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1336-37 (11th Cir. 2022); *Palmer v. McDonald*, 824 F. App'x 967, 980 (11th Cir. 2020); *Williams v. Revco Disc. Drug Centers, Inc.*, 552 F. App'x 919, 922 (11th Cir. 2014). The Agency appropriately requested medical documentation from Gregerson because a thyroid cancer diagnosis from one and a half years earlier would not obviously imply that an employee suffered a disability under the Rehabilitation Act, particularly that the employee would need a space heater as a reasonable

accommodation.  *See Owens, supra.*

Gregerson similarly insists Denenny's May 9, 2022, request constituted bad faith because she already provided medical documentation on April 18, 2022.  (Doc. 43-54 at 3-4).  The court must credit that testimony at this stage, although Gregerson has not provided a copy of that documentation or otherwise identified the information it supposedly contained.  As a result, the record does not portray the documentation Gregerson tendered in April 2022 actually answered any of the Agency's legitimate questions about her disability status and her need for a space heater.

Gregerson also asserts the Agency intentionally delayed consideration of the medical evidence she presented based on the fact she logged in to the Agency's online system on September 15, 2022, and perceived that the Agency had not uploaded materials she had provided until August 12, 2022.  (*Id.* at 3-4).  However, Gregerson has not demonstrated personal knowledge of how or when the Agency considered information she provided, and there exists no evidence the Agency would have considered materials only after uploading them to the online system.  Hill and Denenny attest Denenny promptly forwarded all documents and information Gregerson provided to off-site Agency officials responsible for determining employee requests for disability accommodations.  (Doc. 43-40 at 2-3; Doc. 43-51 at 2).  Email correspondence confirms those statements by establishing Denenny immediately forwarded the note from Gregerson's doctor on June 8, 2022 (Doc. 43-45), and other off-site Agency officials followed up and confirmed the Agency's medical office

received the note and Gregerson's request in early July 2022. (Doc. 43-47). Moreover, the brief note from Gregerson's physician did not explain or confirm Gregerson actually manifested a disability or needed a space heater as a reasonable accommodation. Nevertheless, on or about August 16, 2022, the Agency evaluated Gregerson's request and "medically approved" her as an "employee with a disability." (Doc. 43-48).

Even then, the Agency could not have simply unilaterally granted Gregerson's request, as the Agency's lease for the Albertville office prohibited the use of space heaters. "A third party's rights do not have to be sacrificed on the altar of reasonable accommodation." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 492 (6th Cir. 2019) (cleaned up); *see also Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) (plaintiff's request that apartment building owner provide him with an assigned parking space on ground level of its garage to accommodate his disability was not reasonable when building owner had leased the ground level of the garage to a third party using it for valet parking service). Accordingly, Hill emailed the ADO in mid-August to ask how to proceed. (*Id.*) On or about September 13, 2022, the ADO sought to coordinate with GSA to address the request with the landlord on behalf of the Agency. (Doc. 43-49). On October 11, 2022, the ADO followed up, as it had not received a response from GSA. (Doc. 43-50). The Agency ultimately approved Gregerson's request and delivered a space heater to her work area on October 25, 2022.

Based upon the foregoing review, the record establishes as a matter of law that the Agency did not unreasonably delay in approving Gregerson's accommodation

request. Though the approximately six-month delay may not reflect the height of bureaucratic efficiency, the evidence demonstrates the Agency acted in good faith to process Gregerson's request through multiple administrative steps and layers. Hill and Denenny immediately opened an accommodation request on April 13, 2022, and the Agency reasonably asked Gregerson to provide medical documentation to support her claim, though she did not provide the documentation until at least June 8, 2022. Within approximately two months, the Agency's medical office completed its review, determined Gregerson qualified as disabled, and characterized her request for a space heater as appropriate. The Agency then had to obtain an exemption or waiver from the landlord because of the lease prohibition. Pursuing that matter, however, required the cooperation of a separate federal entity, GSA, which served as the Agency's leasing agent. GSA then secured the necessary permission by October 2022, and the Agency delivered an approved space heater to Gregerson within that same month.

Moreover, Gregerson does not point to any evidence her inability to use a space heater while the Agency processed her request actually caused her to endure any particular harm, such as causing her to miss work or rendering her unable to perform her job functions. She also presents no evidence the Agency imposed a penalty or adverse action.

Because the record depicts the Agency did not unreasonably delay in approving Gregerson's accommodation request, the court will grant the Agency's motion for summary judgment as to this Rehabilitation Act claim. *See Jackson,* 2019 WL 13273394,

at *7; *Hartsfield*, 90 F. Supp. 2d at 1373; *Luke*, 674 F. App'x at 849; *Swain*, 41 F.3d at 898.

## CONCLUSION AND ORDER

Based on the foregoing analyses, the court will **GRANT IN PART AND DENY IN PART** the Agency's motion for summary judgment.  (Doc. 44). Specifically, the court **GRANTS** the motion as to all claims **EXCEPT** Gregerson's Title VII retaliation claims based on (1) the May 16, 2018, verbal reprimand; (2) the November 27, 2018, written reprimand; (3) Gregerson's non-selection for the Thomasville, Georgia Operations Supervisor vacancy; and (4) the retaliatory hostile work environment claim.

**DONE** and **ORDERED** this 30th day of September, 2025.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE